## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 21-CR-527 (RDM)** |
| | : | |
| **v.** | : | **18 U.S.C. § 111(a)(1)** |
| | : | **18 U.S.C. § 113(a)(4)** |
| **ALAN WILLIAM BYERLY,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, ALAN WILLIAM BYERLY, with the concurrence of his attorneys, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020

Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session begin at approximately 1:00 PM. Shortly thereafter, by approximately 1:30 PM, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4.      As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside.

5.      At approximately 2:00 PM, certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

6.      At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 PM, individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.       Shortly thereafter, at approximately 2:20 PM, members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 PM on January 6, 2021. In light of the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 PM after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Alan William Byerly's Participation in the January 6, 2021, Capitol Riot*

8.       The defendant, Alan William Byerly (hereinafter "BYERLY" or "the defendant"), lives in Fleetwood, Pennsylvania. On either January 5, or in the morning of January 6, 2021, BYERLY traveled from Pennsylvania to Washington, D.C. The purpose of BYERLY's trip to Washington, D.C., was to protest Congress' certification of the Electoral College.

9.       Prior to January 6, BYERLY purchased a stun gun, capable of emitting an electronic shock to a victim. BYERLY carried the stun gun with him to Washington, D.C. and had it in his possession when he traveled from the "Stop the Steal" rally at the Ellipse near the White House to the grounds of the U.S. Capitol on January 6, 2021.

10.      At or about 2:10 p.m., on the Lower West Terrace of the Capitol, and within the territorial jurisdiction of the United States, an Associated Press reporter dressed in black, wearing a helmet-style gas mask and a lanyard with Associated Press lettering, and carrying at least one

camera, was pulled backward down a flight of stairs leading up to the Western front of the U.S. Capitol Building by a group.  Shortly afterward, on the same set of stairs but several yards from the original altercation, the victim reporter was confronted by another individual who yelled at the victim and approached him aggressively, causing the victim to retreat backwards up the stairs. An individual involved in the original altercation used both hands and grabbed the media identification lanyard around the victim's neck, then used both hands to drag the victim back down the stairs. BYERLY watched the group that initially pulled the victim down the stairs and the subsequent assault.

11.     At the bottom of the stairs, BYERLY and three other individuals grabbed the victim reporter and pushed, shoved, and dragged him parallel to the stairs, back towards the site of the original assault. Specifically, BYERLY grabbed the victim with both hands near the victim's shoulder and upper chest and pushed the victim backward. BYERLY then continued to push and drag the victim past the site of the original altercation and toward a dense crowd. BYERLY eventually placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and toward a low stone wall that separated the stairs of the west front of the U.S. Capitol Building from the west lawn below.

12.     A short time later, and while still on the Lower West Terrace of the Capitol Grounds, BYERLY approached United States Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers who had formed a line of bike racks to act as a barrier between themselves and against the crowd forming on the Capitol grounds. BYERLY, unprovoked by anything that the officers were doing, approached the officers, raised his right hand that held a stun gun, and activated the weapon. The electrical charge of the stun gun was clearly audible and caused officers, including MPD officers A.G. and I.F.-R., to react.  The officers yelled "taser! taser!

taser!," seemingly to warn other officers that BYERLY was charging and attacking the officers by using a taser. BYERLY's use of the device, later determined to be a Mace Brand Compact stun gun, was recorded by officers' body worn cameras.

13.     Per Mace Brand's website, the stun gun used by BYERLY emits a shock of up to 7.6 microcoulombs and has a bright LED flashlight. A shock from the stun gun of one second or less is capable of causing pain and minor muscle contractions. Use of the stun gun on a person for one to two seconds may cause spasms and a dazed mental state. Stunning a person for three to five seconds may cause loss of balance and muscle control.[1]

14.     After officers successfully removed the stun gun from BYERLY's hands, BYERLY continued to charge toward the officers, physically strike, and push against them. He grabbed an officer's baton.

15.     BYERLY's actions caused an officer to lose his footing and for the officer to fall and land on his hands.

16.     Officers' efforts to restrain BYERLY were met with resistance and additional assaults by BYERLY. BYERLY was able to flee from the officers with the assistance of a fellow rioter.

### *Elements of the Offense*

17.     BYERLY knowingly and voluntarily admits to all the elements of 18 U.S.C. § 111(a)(1). Specifically, BYERLY admits that he forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with any person designated in 18 U.S.C. § 1114, that is, USCP and MPD officers, while engaged in or on account of the performance of their official duties. He admits that he activated a stun gun while holding the stun gun upward in his right hand and lunging with his

---

[1] *See* https://www.mace.com/products/compact-stun-gun.

torso in the direction of police officers who were tasked with protecting the United States Capitol

building and grounds on January 6, 2021. He further admits that he knew at the time of the assault

of the officers that the officers were engaged in the

performance of their official duties or that he assaulted the officers on account of their performance

of their official duties.

18.     BYERLY knowingly and voluntarily admits to all the elements of 18 U.S.C. §

113(a)(4). Specifically, BYERLY admits that he committed an act of striking, beating, or

wounding, the victim reporter, and that such act occurred in the United States Capitol Grounds,

which is within the territorial jurisdiction of the United States.

19.     For the assaults against Officers A.G. and I.F.-G. and the victim reporter,

BYERLY acknowledges that he acted voluntarily and on purpose, and not by mistake, accident,

or other legal justification.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:     /s/ Anita Eve
        Anita Eve
        Assistant United States Attorney
        PA Bar No. 45519

## DEFENDANT'S ACKNOWLEDGMENT

I, ALAN WILLIAM BYERLY, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 7/15/22

Alan William Byerly
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 7/15/22

James McHugh
Attorney for Defendant