**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 21-CR-527 (RDM)** |
| | : | |
| **v.** | : | **18 U.S.C. § 111(a)(1)** |
| | : | **18 U.S.C. § 113(a)(4)** |
| **ALAN WILLIAM BYERLY,** | : | |
| | : | |
| **Defendant** | : | |
| | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence defendant Alan William Byerly to at least 46 months' incarceration, 36 months' supervised release, $2,000 in restitution, and the mandatory $125 special assessment. The government is recommending a sentence at least at the top of the stipulated Guidelines range of 37-46 months incarceration because Byerly committed three separate assaults on January 6, 2021, two against different police officers at different times and places, and one against a news reporter. His stipulated Guidelines range, however, is no higher than it would have been had committed only a single assault. A sentence at least at the top of the stipulated Guidelines range would adequately take into account all three assaults.

## I.    INTRODUCTION

Alan William Byerly participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in

losses.[1]

Prior to January 6, 2021, Byerly purchased a stun gun, capable of emitting an electronic shock to a victim. Byerly carried the stun gun with him when he traveled from his home in Pennsylvania to the District of Columbia, and had it with him as he, like thousands of others, marched on the Capitol on January 6.

Byerly engaged in three separate assaults on the west side of the Capitol Building, two against police and one against a news reporter. First, he assisted a group of rioters who used a large Trump sign inside a heavy steel frame with steel caster wheels as a battering ram against barricades and a line of police officers that separated the rioters from the Capitol on the stairs leading to the Capitol Building.[2]

Second, Byerly participated in a vicious assault against an Associated Press reporter, identified as such by a prominent lanyard he was wearing, who was dragged up and down the stone staircase on the Lower West Terrace of the Capitol's grounds

Later still, Byerly used his stun against United States Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers who had formed a line of bike racks to act as a barrier between themselves and against the crowd forming on the Capitol grounds. After officers removed the stun gun from Byerly's hands, he continued to charge toward the officers, physically striking and pushing against them. He also grabbed an officer's baton.

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

[2] Following the indictment and the defendant's plea in this case, the government discovered that Byerly was also involved in another assault involving federal law enforcement officers on January 6. The details of that assault, involving the use of a Trump billboard as a battering ram against officers, is described in this memorandum.

To reflect the gravity of Byerly's conduct, the government recommends that the Court sentence Byerly to at least 46 months' incarceration, which is within the stipulated advisory Guidelines' range of 37-46 months' imprisonment.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, thousands of rioters, Byerly among them, unlawfully entered onto the restricted grounds of the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; the rioters that entered into the Capitol Building terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. Although the facts and circumstances surrounding the actions of each rioter who breached the U.S. Capitol and its grounds differ, each rioter's actions were illegal and contributed, directly or indirectly, to the violence and destruction that day. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan).

As set forth in the Statement of Offense incorporated into Byerly's plea agreement, a joint session of Congress had convened at approximately 1:00 p.m. at the U.S. Capitol. Members of the House of Representatives and the Senate were meeting to certify the vote count of the Electoral College of the November 3, 2020 Presidential election. By approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate

chamber.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. Temporary and permanent barricades were in place around the exterior of the building, and U.S. Capitol Police were present and attempting to keep the crowd away from the building and the proceedings underway inside. At approximately 2:00 p.m., certain individuals forced their way over the barricades and past the officers, and the crowd advanced to the exterior of the building. Members of the crowd did not submit to standard security screenings or weapons checks by security officials.

The vote certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to keep the crowd from entering; however, shortly after 2:00 p.m., individuals in the crowd forced their way in, breaking windows and assaulting police officers along the way, while others in the crowd cheered them on.

At approximately 2:20 p.m., members of the House of Representatives and the Senate, including the President of the Senate, Vice President Pence, were forced to evacuate the chambers. All proceedings, including the joint session, were effectively suspended. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed. *See* ECF No. 44, Statement of Offense ¶¶ 2-7.

### Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol's Grounds

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their

actions, each blow helped the crowd penetrate further into the USCP's defenses until the building itself was accessible and the occupants were at risk.  The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 pm, a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a

half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A. At 12:52 pm, the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram by rioters, including Byerly, is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 pm, the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 pm, Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee

and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 pm, with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 pm to build to a torrent.



*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

### *Injuries and Property Damage Caused by the January 6, 2021 Attack*

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). This Court and several of its colleagues have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building— but of our democracy itself." *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (this Court); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Chief Judge Howell); *United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (Judge Chutkan).

In addition, the rioters injured more than a hundred police officers. *See* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), at 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFullReport_ExaminingU.S.Capitol Attack.pdf (describing officer injuries). Some of the rioters wore tactical gear and used dangerous weapons and chemical irritants during hours-long hand-to-hand combat with police officers. *See id.* at 27-30.

Moreover, the rioters inflicted significant emotional injuries on police officers and others on scene that day who feared for their safety. *See id*; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

Finally, the rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways. *See id*; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues). The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**B.     Byerly's Role in the January 6, 2021 Attack on the Capitol**

Each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Byerly's conduct and behavior on January 6.

Byerly planned to attend the "Stop the Steal" rally in support of former President Donald Trump on January 6, 2021. In anticipation of the trip, Byerly went to a Cabela's store and

purchased a stun gun. He traveled with that stun gun from his home in Fleetwood, Pennsylvania to Washington, D.C. and attended the rally. He left the former President's speech early because he wanted to get as close as he could to the U.S. Capitol. Byerly arrived on the west side of the Capitol at approximately 1:10 p.m. and found that police officers were at the top of the stairs blocking entrance to the Capitol.

At approximately 1:40 p.m., Byerly joined other rioters carrying an enormous Trump sign and helped them use the sign as a battering ram at the barricades and police line on the stairs on the West Plaza. The all-metal sign was approximately eight feet tall and 10 feet wide, welded with screws, and supported by large casters that were approximately the size of a man's head. Video Exhibit 1 shows the full scale of the enormous sign and the danger that police officers faced and includes Byerly's first assault of officers. [3] Screenshots of Byerly's interaction with other rioters using the sign as a battering ram, including by reaching up and placing his right hand on the edge of the sign are below in Exhibit 5:

---

[3]     In conjunction with this sentencing memorandum, the government will submit video exhibits depicting Byerly's activities, including videos that were captured by officer body worn cameras and from once publicly available sources. The videos provided to the Court will constitute some, but not all available videos.





*Exhibit 5: Byerly in the crowd of protestors that began to use a Trump sign to break down barricades and push police officers on the steps on the West Front of the Capitol.*

Police officers standing on the stairs on the West Front of the Capitol shouted to one another to protect themselves from this large and dangerous moving object being propelled by the rioters. The efforts of Byerly and the other rioters resulted in the destruction of the bike rack barrier, created a gaping hole in the police line, and caused considerable chaos to the officers. See Exhibit 6.







*Exhibit 6: Trump sign used as a battering ram by rioters, including Byerly, to destroy barricades and police line.*

As described by USCP Officer N.S., who was part of the defensive line, the Trump sign was heavy and very sturdy and, in part due to the relatively sharp edges of the metal frame, could have "split someone's head open." Officers such as N.S. and others not wearing a helmet who were near or came in contact with the sign frame were particularly vulnerable to serious injury or worse. Fortunately, police officers at the scene succeeded in wresting the billboard from the rioters and moving it out of their further reach.

Byerly then moved to the Lower West Terrace of the Capitol, where an Associated Press reporter dressed in black, wearing a helmet-style gas mask and a lanyard with Associated Press lettering, and carrying at least one camera, was pulled backward down a flight of stairs leading up to the Western front of the Capitol Building by a group of rioters. Shortly afterward, on the same set of stairs but several yards from the original altercation, another rioter yelled at the victim reporter and approached him aggressively, causing the victim to retreat backwards up the stairs. A rioter involved in the original altercation grabbed the media identification lanyard around the victim's neck with both hands, then dragged the victim back down the stairs. Byerly watched the group of rioters as they pulled the victim down the stairs. Exhibit 7 is a screenshot of Byerly watching the assaults of the victim reporter:



*Exhibit 7: Byerly in the crowd of protestors watching other rioters assault victim reporter.*

At the bottom of the stairs, Byerly and three other rioters began to assault the victim reporter. Byerly grabbed the victim with both hands near the victim's shoulder and upper chest and pushed him backward. Byerly then pushed and dragged the victim past the site of the original altercation and toward a dense crowd. Byerly eventually placed both of his hands in the area of the victim's face and neck and continued to shove and push the victim away from the stairs, and

toward a low stone wall that separated the stairs of the West Front of the Capitol Building from the west lawn below. See Video Exhibit 2. Additionally, Exhibit 8 contains screenshots of Byerly's violent interaction with the victim reporter.[4]





*Exhibit 8: Byerly's assault of victim reporter.*

A short time later, at approximately 2:10 p.m., and while still on the Lower West Terrace, Byerly approached other USCP and MPD officers standing behind a line of bike racks.

---

[4]     As revealed later in this memorandum, Byerly admitted to assaulting the reporter during his custodial interview.

Unprovoked by anything that the officers were doing, Byerly approached the officers, raised his right hand that held his stun gun, and activated the weapon. The electrical charge of the stun gun was clearly audible and caused the officers, including MPD officers A.G. and I.F.-R., to react. The officers yelled "taser! taser! taser!" to warn their fellow officers of the threat Byerly posed. The officers' body worn cameras recorded Byerly's use of what was later determined to be a Mace Brand Compact stun gun.

Video Exhibit 3 captures the moment officers reacted to Byerly using the stun gun. The following are screenshots of the videos captured by officer body worn cameras when Byerly deployed the stun gun, Exhibit 9, are below:





*Exhibit 9: Byerly's attack of police officers with a stun gun in his right hand.*

After officers successfully removed the stun gun from Byerly's hands, Byerly continued

to charge toward the officers, struck and pushed them, and grabbed an officer's baton. Exhibit 10

are screenshots of Byerly's effort to grab the officer's baton:





*Exhibit 10: Byerly's effort to grab an officer's baton.*

Exhibit 11 is another screenshot of Byerly grabbing the officer's baton:



*Exhibit 11: Byerly grabbing officer's baton.*

At approximately 2:11:05 p.m., a cloud of smoke (possibly from a fire extinguisher) was dispersed from the direction of the riot crowd as Byerly, wearing a Kutztown beanie, wrestled with the police officer for his baton. See Exhibit 12.



*Exhibit 12: Byerly confronting police officers in a cloud of smoke.*

Byerly continued to assault the officers. At approximately 2:11:07 p.m., while officers attempted to restrain him, Byerly continued to charge at Officer A.G. As depicted in Exhibit 13,

at approximately 2:11:09, while attempting to defend himself against and restrain Byerly, Officer A.G. lost his footing, fell to the ground, and landed on his hands.



*Exhibit 13: Byerly caused Officer A.G. to fall to the ground when Byerly wrestled with the officer over his baton.*

The officers' efforts to restrain Byerly were met with his resistance and additional assaults. Video Exhibit 4 illustrates Byerly's continued assault with officers following the use of the stun gun.

With the assistance of other rioters, Byerly extricated himself from the officers and fled. He eventually left the Capitol grounds at approximately 3:30 p.m. Before leaving, however, another rioter recorded Byerly confess to his assaultive conduct on January 6, see Video Exhibit 5.

### *Destruction of Evidence*

From the videos referenced above, it is clear that Byerly wore a gray "Kutztown" beanie, a distinctive neon "safety" yellow long-sleeve shirt under a black jacket with blue jeans, black shoes, a gray and black striped face covering, and a black backpack. During his custodial interview, Byerly stated that he got rid of the beanie hat after January 6, apparently because he anticipated that he would be caught by the FBI. He retained the face mask and backpack and identified where

they could possibly be found in his home in Fleetwood, Pennsylvania.

### *Injuries*

The officers guarding the Capitol on the West Lower Terrace were the victims of the Trump sign assault in which Byerly joined and of Byerly's use of the stun gun. At least officers A.G. and I.F.-R. have been identified as those who were victims of the stun gun assault and wrestling of the baton from an officer. J.M. is the victim reporter. Although the officers and victim reporter did not report any lasting injuries as a result of being the subjects of Byerly's criminal conduct, depicted in Exhibits 5-13, Byerly's conduct helped facilitate the eventual breach of the Capitol and aided those rioters who injured officers and destroyed property on January 6. *See* "Injuries and Property Damage Caused by the January 6, 2021 Attack," *supra.* Byerly's violent conduct served to incite and embolden other violent rioters around him.

### *Byerly's FBI Interview*

Byerly was arrested on July 7, 2021, and agents conducted a post-Miranda interview. At first, Byerly acknowledged that he had been present in Washington, D.C. on January 6, 2021, but minimized his conduct. He stated that he did just "one stupid thing down there and that's all it was." This was a reference to how he handled the reporter and nothing more.

Byerly stated that he traveled from Pennsylvania to Washington, D.C. via bus on January 6. He went to the "Stop the Steal" rally and left before President Trump finished his speech because Byerly wanted to get to the Capitol where he believed a "peaceful protest" was to take place. When he arrived on the grounds of the Capitol, he stated that the barricades had already been torn down and police officers had formed a line on the top of the stairs on the West Front of the Capitol.

The next instance that Byerly described was his encounter with the reporter. He admitted to grabbing the person who turned out to be a reporter and told him to "get the fuck out of here."

To wit, Byerly said that was all his arrest was about and that his conduct was nothing more than a misdemeanor offense. He added, "What a bunch of bs . . . Trump supporters getting . . . ." Byerly didn't finish his thought, instead he just shook his head in disgust.

Byerly unequivocally denied getting into any other confrontations. This statement led one of the agents to produce images on his cell phone and show them to Byerly. Byerly admitted that the images were of him and showed him wearing a Kutztown beanie cap.

Byerly also denied that he was holding anything in his hand in the images. He further denied bringing a flashlight to the Capitol. The agent showed Byerly additional images and asked what was in his hand. Byerly acknowledged that the item that appeared to be in his hand looked like a flashlight, but it was not familiar to him. He repeatedly denied holding anything in his hand, grabbing an officer's baton, and hitting the ground at any time.

After more than 30 minutes of denials of his conduct, Byerly apologized to lying to the agents and admitted that he purchased a "weak taser" and carried it to Washington, D.C. He stated that he did have it in his hand in the images and he "hit it," meaning he used it. He made no mention of the fact that he assaulted police officers with the stun gun, the officers' response to his use of the stun gun, or wrestling with an officer for his baton. Moreover, Byerly made absolutely no mention of the Trump sign that he helped other rioters use as a battering ram against the police officers attempting to hold a defensive line on the steps of the Capitol.

Rather than expressing remorse for, let alone mentioning the mentioning the two separate assaults of police officers, the only conduct that Byerly acknowledged and identified was wrong was his assault of the reporter.

Byerly concluded the interview by stating, "This is political fucking persecution. This is a simple citation and me go to court and pay a fine locally and now the federal government's in it

and it's all politically fucking pushed for to persecute any Trump supporters."

## II.    THE CHARGES AND PLEA AGREEMENT

On July 7, 2021, Byerly was arrested pursuant to a multi-count criminal complaint filed

in the District of Columbia.  On October 29, 2021, a federal grand jury returned a superseding

indictment charging Byerly with Civil Disorder in violation of 18 U.S.C. § 231(a)(3); Assaulting,

Resisting, or Impeding Certain Officers Using a Deadly or Dangerous Weapon, in violation of 18

U.S.C. § 111(a)(1) and (b); Entering or Remaining in any Restricted Building or Grounds, in

violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Disorderly and Disruptive Conduct in a

Restricted Building Grounds, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Physical

Violence in Restricted Grounds Using and Carrying a Deadly or Dangerous Weapon, in violation

of 18 U.S.C. § 1752(a)(4) and (b)(1)(A); Physical Violence in the Capitol Grounds, in violation

of 40 U.S.C. § 5104(e)(2)(F); Striking, Beating, or Wounding of Another Person within the

Territorial Jurisdiction of the United States, in violation of 18 U.S.C. § 113(a)(4); and, Simple

Assault within the Territorial Jurisdiction of the United States, in violation of 18 U.S.C. §

113(a)(5). ECF Nos. 18, 24.

On July 23, 2022, pursuant to a plea agreement and stipulated statement of offense, ECF

Nos. 43 and 44, Byerly pled guilty to Count Two, Assaulting, Resisting, or Impeding Certain

Officers, in violation of 18 U.S.C. § 111(a)(1),[5] and Count Seven, Striking, Beating, or Wounding

of Another Person Within the Territorial Jurisdiction of the United States, in violation of 18 U.S.C.

§ 113(a)(4).

## III.   STATUTORY PENALTIES

---

[5]     In the plea agreement, the government agreed to dismiss the allegation as to 18 U.S.C. §
111(b) and all other charges. ECF 43.

Byerly now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1), and Striking, Beating, or Wounding of Another Person Within the Territorial Jurisdiction of the United States, in violation of 18 U.S.C. § 113(a)(4). As noted by the plea agreement, Byerly faces up to eight years of imprisonment for the Section 111(a)(1) offense, and up to one year of imprisonment for the Section 113(a)(4) offense, a combined fine of up to $350,000, a combined term of supervised release that, because all the release terms must be served concurrently, cannot exceed three years, and a combined $125 special assessment.

## IV.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The Guidelines calculation in the Presentence Investigation Report ("PSR") mirrors that in the plea agreement. That Guidelines analysis is as follows:

<u>Count Two: 18 U.S.C. § 111(a)(1)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of Dangerous Weapon | 4 |
| U.S.S.G. § 3A1.2(a) and (b) | Official Victim | <u>+6</u> |
| | | 24 |

<u>Count Seven: 18 U.S.C. § 113(a)(4)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.3 | Assault (victim J.M.) | +7 |

26

Pursuant to U.S.S.G. § 3D l.4(a), the difference between the distinct groups of conviction is 17, and thus pursuant to § 3D1.4(c), the combined offense level is 24.

The parties agreed that Byerly was entitled to a reduction in his guideline range for his acceptance of responsibility pursuant to U.S.S.G. §§ 3E1.1 (a) and (b). Accordingly, the total adjusted offense level is 21. *See* ECF No. 43, ¶ 4; PSR ¶ 12.

The U.S. Probation Office calculated Byerly's criminal history as category I, which the government does not dispute. PSR ¶ 13. Byerly's criminal history includes the following activities that resulted in punishment:

(1)     5/6/2008: Accident with damage to attending vehicle and property – 6 months' probation;

(2)     3/28/2005: Driving under the influence – 3 to 180 days' confinement;

(3)     1/17/1991: Infliction of corporal punishment – 150 days' confinement; 48 months' probation; and

(4)     7/16/1990: Battery – 8 days' confinement; 36 months' probation.

ECF No. 43, ¶ 4; PSR ¶ 62-66. Accordingly, based on the government's calculation of Byerly's total adjusted offense level, after acceptance of responsibility, at 21, Byerly's Guidelines imprisonment range is 37 to 46 months' imprisonment.

## V.     ANTICIPATED DEFENSE VARIANCE ARGUMENT

Notwithstanding the calculated Guidelines included in the plea agreement, Byerly has informed the government that he intends to seek a downward variance on the ground that the stun gun was not a "deadly or dangerous weapon" under 18 U.S.C. § 111(b)(a) and that the Court should consider the degree of the dangerousness of the weapon as bases for a variance from the applicable guideline range.

The stun gun possessed and used by Byerly meets the definition of a dangerous weapon, "an instrument capable of inflicting death of serious bodily injury." U.S.S.G. § 1B1.1, cmt., n. 1(d). "Serious bodily injury" is defined as "injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention." § 1B1.1, cmt. n. 1(j). Courts have consistently held that a stun gun is a dangerous weapon and the defense, in their suggestion that we apply § 2A2.4(b)(1)(B), seemingly concedes that the subject stun gun is a dangerous weapon. *See United States v. Agron*, 921 F.2d 25, 26 (2d Cir. 1990) (affirming application of dangerous weapon enhancement for use of a stun gun; "The incapacitation caused by a stun gun constitutes sufficient 'impairment,' particularly in light of the Guidelines' rationale behind the two-level enhancement for such possession."); *United States v. Wallace,* 800 F.2d 1509, 1513 (9th Cir. 1986) (trial evidence that stun guns may cause permanent injury to eyes was introduced to prove stun guns are dangerous weapons)

An electronic device that is designed for the purpose of and capable of producing death or serious bodily harm is a dangerous weapon and may be held to be an inherently dangerous weapon as a matter of law. Per Mace Brand's website, the stun gun used by Byerly emits a shock of up to 7.6 microcoulombs and has a bright LED flashlight. The website states that a shock from the stun gun of one second or less is capable of causing pain and minor muscle contractions. Use of the stun gun on a person for one to two seconds may cause spasms and a dazed mental state. Stunning a person for three to five seconds may cause loss of balance and muscle control.[6] Furthermore, the packaging for the stun gun identifies it as a device capable of causing serious injury. *See* Exhibit 12:

---

[6] *See* https://www.mace.com/products/compact-stun-gun.



*Exhibit 12: Mace stun gun.*

In *United States v. Quiver*, 805 F.3d Cir. 1269 (10th Cir. 2015), the Court affirmed the district's court application of a four-level sentencing increase for use of a dangerous weapon during an assault by a defendant with a taser in stun gun mode.[7] The Court found that the taser even in stun gun mode was a dangerous weapon. The Court rejected the defendant's argument that § 2A2.2(b)(2) required that a dangerous weapon be used in a way that it is capable of causing death or serious bodily injury. Regarding the defendant's use of the taser, the Court

---

[7] Stun guns and tasers are similar but not identical self-defense weapons. "An electroshock weapon is a less-lethal weapon that utilizes an electric shock to incapacitate a target by either temporarily disrupting voluntary muscle control and/or through pain compliance.… An electroshock is not a taser, though the two terms are often used interchangeably, stun guns and Tasers refer to two different devices. Stun guns administer an electric shock through direct contact, whereas a taser device administers the shock through thin flexible wires connected to two probes that are fired into the target." https://en.wikipedia.org/wiki/Electroshock_weapon. (visited September 29, 2022). *See generally United States v. Gonzalez*, 200 F. Supp. 3d 1265, 1270 (D.N.M. 2016) ("a Taser is a 'dangerous weapon' within § 2D1.1(b)(1)'s meaning").

stated:

> Under the guideline, an assaulter's using a dangerous weapon in any fashion
> unleashes an unacceptable risk that death or serious bodily injury might follow.
> Its four levels apply whether or not any bodily injury ensues. When assaulters do
> in fact cause bodily injuries with dangerous weapons, the assaulters receive *extra*
> punishment under § 2A2.2(b)(3) based upon the severity of the bodily injury.

805 F.3d at 1272. Quiver faced a guideline range of 92 to 115 months' imprisonment, but the

district court varied downward to a 70-month sentence **only** because of the relative danger posed

by the taser as opposed to a firearm.

Accordingly, the evidence in this case supports the finding that the stun gun was a

dangerous weapon. As to the question of whether a variance is appropriate, this Court should

examine the circumstances that existed on January 6. Here, Byerly deployed the stun gun in the

midst of a riot. He used it against officers who were already attempting to protect the Capitol

against the massive crowd that trespassed onto the grounds of the Capitol and were

overwhelmed. Byerly used the weapon when he was not provoked by the officers and only for

his own intentions. Fortuitously, none of the officers was injured, but that does not take away

from the fact that the stun gun was a dangerous weapon, capable of causing injury to eyes and

other sensitive body areas. Moreover, Byerly used the stun gun in his third assault, after first

assaulting a line of police officers and next assaulting a news reporter.

There is nothing about the circumstances here which warrants a variance. Therefore, the

government opposes a variance and promotes the recommended sentence that falls within the

guideline range of 37 to 46 months' imprisonment.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In addition to the Sentencing Guidelines, sentencing is guided by 18 U.S.C. § 3553(a).

Some of the factors this Court must consider include: the nature and circumstances of the offense,

§ 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on his or her individual conduct, each person who entered the Capitol and assaulted police officers on January 6 did so under the most extreme of circumstances, to which their conduct directly contributed. Any of the rioters present on the West Front of the Capitol on January 6 would—at a minimum—have crossed through numerous barriers and barricades, heard the throes of a mob, and smelled chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, they likely would have observed extensive fighting with law enforcement.

When looking at Byerly's individual conduct, this Court, in determining a fair and just sentence, should look to a number of critical factors, to include: (1) whether the defendant encouraged violence; (2) whether the defendant encouraged any acts of property destruction; (3) the defendant's reaction to acts of violence or destruction; (4) whether during or after the riot, the defendant destroyed evidence; (5) the length of the defendant's time inside or outside of the

building, and exactly where the defendant traveled and activities during the span of time; (6) the defendant's statements in person or on social media; (7) whether the defendant cooperated with, or ignored, law enforcement or confronted law enforcement; and (8) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of Byerly's criminal conduct weigh heavily toward the recommended period of incarceration. To begin with, Byerly arrived in Washington, D.C. prepared to either engage in or confront others with a stun gun. Thus, his intent and subsequent conduct was premeditated.

As Byerly admits, he left the "Stop the Steal" rally early and went to the Capitol because he wanted to be as close to the Capitol as could. He acknowledged that he arrived at approximately 1:10 p.m. and, as Exhibit 3 herein shows, a crowd of rioters assembled on the West Front of the Capitol at that approximate time. At approximately 1:40 p.m., he joined rioters who hoisted a Trump sign and used it as a battering ram to obliterate the barricades and disperse the police line that was shielding the Capitol building. Later, Byerly joined rioters who were assaulting a reporter.

Later still, Byerly engaged in an unprovoked attack on USCP and MPD officers with a stun gun as depicted in Exhibit 7. He deployed the stun gun, causing an electronic pulse to be emitted. The sound of the stun gun caused the officers who stood directly in front of Byerly to react and yell, ""taser! taser! taser!" The officers scrambled to dispossess Byerly of the weapon. But even after the stun gun was removed from his hand, Byerly  wrestled with an officer to gain control of his baton,  causing the officer to fall to the ground and land on his hands. Fortunately, the officer was able to maintain control of his baton. *See* Exhibits 8-11.

Byerly's multiple violent confrontations with police officers guarding the Capitol

distracted them from confronting other rioters seeking to breach the Capitol Building, allowing them to gain entry to the building they might not have achieved without Byerly's involvement in the riot. Byerly's assault of the reporter further established his violent intentions on January 6th. The seriousness of these offenses demands the lengthy sentence of imprisonment that the government has recommended.

B.     **Byerly's History and Characteristics**

Byerly lacks any scorable criminal history but he has repeated contacts with the criminal justice system. He has two old convictions for battery, at least one of which involved an assault on a domestic partner. *See* PSR ¶ 62-63. He also has a more recent conviction for DUI. PSR ¶ 64. Finally, he has four arrests that did not result in convictions, the most recent of which, for harassment, occurred 10 years ago. PSR ¶¶ 67-70.

C.     **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[8] As with the nature and circumstances of the offense, this factor supports the recommended period of incarceration. Byerly's criminal conduct, assaulting officers and a member of the media is the epitome of disregard for the law.

From the very moment that Byerly arrived at the Capitol at approximately 1:10 p.m., he had no doubt either pushed through or otherwise penetrated the barriers that police officers had

---

[8] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

installed around the perimeter of the Capitol. He nevertheless made his way to the barricades and formation of USCP and MPD officers who formed a defensive line at the top of the West Plaza stairs. He, like many other rioters, disrespected the barricades and police presence when he chose to join those other rioters by participating in the use of the Trump sign as a battering ram against the barricades and officers. The siege of the rioters that Byerly aligned himself with overwhelmed the physical barricades and also overwhelmed and outnumbered the officers, placing the latter in serious danger.

The rule of law was also disrespected when Byerly, unprovoked by anything officers did, other than being physically present and serving as an obstacle to entry into the Capitol, Byerly chose to deploy the stun gun with which he had equipped himself before leaving his home in Pennsylvania. He did not use the device in self-defense, instead he used it as an offensive weapon at the surprise of and against the overwhelmed and vulnerable police officers.

Byerly's attack of the victim reporter was a third violent assault on January 6.

Given not just his treatment of the reporter, but the police officers, Byerly treated January 6 as a normal, crime-free day, akin to the movie, "The Purge," when he could do whatever he wanted without judgment or legal consequence. He was mistaken.

Thus, the recommended sentence will serve to inform the public, and other potential rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers and others in the District of Columbia are taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

**D.     The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[9] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated by many rioters to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by this Court during sentencing in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of the offenses in this case demands deterrence. Byerly's and other rioters' conduct on January 6 was hardly a protest. *See id.* at 46 ("I don't think that any plausible argument

---

[9] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Although Byerly has a criminal history category of I, his criminal history, in combination with his preparation for violence with the stun gun that he brought to Washington, D.C. and then used without provocation shows someone who has a long history of unlawful violence. He certainly demonstrated no inclination to shy away from violence on January 6 and had many opportunities to do so.

Although Byerly has accepted responsibility and pled guilty in this case, when he was first confronted with his criminal conduct following his arrest, he intentionally minimized his January 6 conduct, stating "I did one stupid thing down there and that's all."  At no time has Byerly ever expressed remorse for his conduct. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Byerly's sentence must be sufficient to provide specific deterrence from committing future crimes of violence, particularly in light of his violent conduct om this case and prior history.

36

E.     **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's

recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged hundreds of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Byerly and others like him committed on January 6 are unprecedented. These crimes defy statutorily appropriate comparisons to other obstructive related conduct in other cases. To try to mechanically compare other defendants convicted of violating Section 111 before January 6, 2021, would be a disservice to the magnitude of what the riot entailed and signified.

As of the date of this sentencing memorandum, there are no known Capitol Riot defendants that have been sentenced for using a stun gun against officers in violation of 18 U.S.C. § 111(a)(1). However, there have been a number of cases in which the defendants who have been sentenced for violations of Section 111(a)(1) which are worthy of consideration here.

In *United States v. Cody Mattice and James Mault*, 21-cr-657 (BAH), Mattice's pre-riot text message conversations with his codefendant, James Phillip Mault, revealed that they anticipated and planned for violence on January 6. During the riot, Mattice recorded Mault as he encouraged police officers to stand aside and allow the rioters to invade the Capitol Building while it was still occupied by Members of Congress. When the vastly outnumbered officers refused to

38

give way, Mattice pulled down a section of bike rack fencing separating the officers from the crowd. Then Mattice and Mault led the mob that penetrated the police line in the West Plaza, forcing officers to retreat to the Lower West Terrace. Later, Mattice and Mault "body-surfed" over other rioters to reach the mouth of the Lower West Terrace tunnel and used a chemical spray against the police officers who refused to yield to the mob. For those crimes, Chief Judge Howell sentenced both defendants to 44 months' incarceration, 36 months' supervised release, and $2,000 restitution.

In *United States v. Richardson*, 21-cr-721 (CKK), the defendant struck a police officer with a metal pole three times, then helped a group of rioters force the large Trump sign shown in Exhibits 5 and 6 of this memorandum into a besieged line of police officers on the stairs of the West Front of the Capitol. Like Byerly, Richardson prepared for violence on January 6 by bringing a metal pole with him to the Capitol. He only stopped striking the officer with the pole when the pole broke. Also, like Byerly, who minimized his January 6 conduct during his post-arrest interview, in interviews with law enforcement officers and the court, Richardson struggled to acknowledge his contributions to the violent attack and the serious impact his actions had on police on January 6. Judge Kollar-Kotelly to 46 months' imprisonment, 36 months' supervised release, and $2,000 restitution.

Similarly, in *United States v. Marshall Neefe*, 21-cr-567 (RCL), the defendant participated with Byerly and other rioters in thrusting the large metal Trump billboard into the defensive line of police officers on the West Front of the Capitol. After the officers' line broke, Neefe entered the Capitol, disregarded police officers' commands to leave the Rotunda, and exited the building after spending over 40 minutes inside. Neefe pleaded guilty to Conspiracy to Obstruct an Official Proceeding, in violation of 18 U.S.C. Section 1512(k), and a lesser-included offense of Assaulting,

Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of 18 U.S.C. Sections 111(a)(1), 2. As is the case here, the lesser-included offense did not include the charged weapon enhancement under 18 U.S.C. Section 111(b). Neefe's guideline range was 41 to 51 months' imprisonment. Neefe belatedly admitted that his conduct was "wrong" and expressed some remorse. Judge Lamberth imposed a sentence of 41 months' imprisonment, followed by 36 months' supervised release and $2,000 restitution.

Three additional defendants have been sentenced for using objects to strike officers and were convicted of violating 18 U.S.C. § 111(a)(1) and (b), and were subject to higher advisory Sentencing Guidelines ranges than those convicted of violating only Section 111(a). In all but one of those cases, the Court sentenced the defendant within the Guideline range.

In *United States v. Robert Palmer*, 21-cr-328 (TSC), the defendant repeatedly assaulted police officers with a wooden plank and then sprayed officers with a fire extinguisher, which he later threw at them, while on the Lower West Terrace of the Capitol. Palmer's conduct after January 6 disqualified him from the reduction for acceptance of responsibility under § 3E1.1. The government requested a sentence of 63 months' imprisonment, at the bottom of the Guidelines that included no benefit for acceptance of responsibility. Judge Chutkan sentenced Palmer to 63 months' imprisonment, 36 months' supervised release, and $2,000 restitution.

In *United States v. Nicholas Languerand*, 21-cr-353 (JDB), the defendant observed violence at the Capitol for two hours before joining with other rioters to assault police officers on the Lower West Terrace. Languerand threw sticks and a traffic bollard at police officers and eventually used a riot shield against them. For that violation of Section 111(a)(1) and (b), the government requested a sentence of 51 months' imprisonment, at the midpoint of the defendant's guideline range. Judge Boasberg imposed a sentenced of 44 months' imprisonment, two months

below the bottom of the Guidelines range, along with 24 months' supervised release, 60 hours of community service, and $2,000 restitution. Judge Boasberg expressly took into account Languerand's acknowledgement that his violent conduct on January 6 was wrong and his unusually difficult childhood marked by, among several notable traumas, his father's imprisonment for setting the trailer Languerand lived in with his mother on fire.

In *United States v. Devlyn Thompson*, 21-cr-461 (RCL), the defendant assaulted an officer with a police baton while on the Lower West Terrace, threw a large box speaker at a police line, and stayed in the area of some of the most vicious assaults for multiple hours. As a major mitigating factor, Thompson independently contacted law enforcement and agreed to plead guilty prior to his arrest. For that violation of Section 111(a)(1) and (b), the government requested a sentence of 48 months' imprisonment, near the bottom of Thompson's Guideline range. Judge Lamberth imposed a sentence of 46 months' imprisonment, at the bottom of the Guidelines range, followed by 36 months' supervised release and $2,000 restitution.

Here, like Mault and Mattice, Byerly was charged under 18 U.S.C. § 111(b), which carries a maximum sentence of twenty years when a defendant assaults federal officers using a deadly or dangerous weapon. The parties agreed to Byerly pleading guilty to the lesser included offense of violating Section 111(a), which carries a maximum sentence of eight years. Thus, Byerly has already received the benefit of a lower Guideline range than his criminal conduct merited.

Like Richardson, Mault and Mattice, Byerly's assault on the police officers with a weapon was premeditated. Byerly brought the stun gun with him to the Capitol on January 6 and his actions were not in self-defense. Instead, his use of the stun gun was unprovoked and alarming to the police officers.

Unlike all of the foregoing cases, Byerly also assaulted a member of the media, the victim

reporter in this case. The reporter was armed with nothing more than a camera and helmet and, thus, was defenseless. Again, the reporter did nothing to provoke Byerly. Byerly watched other rioters attack the reporter, apparently motivated by his professional status, media lanyard, then joined in the assault.

Byerly was permitted to plead guilty to a single violation of 18 U.S.C. Section 111(a) even though he committed at least two assaults against different police officers at different times and places on January 6. He also pled guilty to striking a reporter within a federal enclave, in violation of 18 U.S.C. Section 113(a)(4). The statutory crimes do not group because there were separate victims, but the offense level for the assault on the reporter did not increase the combined offense level.

The government is seeking a sentence at least at the top of the applicable Guidelines range because of all of the assaults that Byerly committed and so that Byerly will not be able to, in effect, be sentenced for a single assault when he committed multiple assaults. Accordingly, a sentence that adopts the government's recommendation of at least 46 months' incarceration and 36 months' supervised release would not constitute an unwarranted sentencing disparity.

## VII.   RESTITUTION

This Court should impose the stipulated restitution amount in the plea agreement of $2,000, which every January 6 felony defendant who has pleaded guilty has agreed to and received. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

sentence of 46 months' imprisonment, 36 months' supervised release, restitution of $2,000, and the mandatory $125 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:   */s/ Anita Eve*
Anita Eve
Caroline Burrell
Assistant United States Attorneys