**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **CRIMINAL NUMBER 21-527** |
| | : | |
| | : | |
| **ALAN WILLIAM BYERLY** | : | |

<u>**SENTENCING MEMORANDUM
OF DEFENDANT ALAN WILLIAM BYERLY**</u>

Alan Byerly makes no excuses for his conduct on the date of this offense.   He is remorseful and has accepted full responsibility for his actions and has pled guilty pursuant to a written plea agreement.   Specifically, after investigation and negotiation, the government has agreed to dismiss the most serious charge of Assault on an Officer with a Deadly Weapon (18 U.S.C. § 111(b)) and in return Mr. Byerly pled guilty to the charges of Assault on an Officer in violation of 18 U.S.C. § 111(a) (Count Two) and Striking another Person in violation of 18 U.S.C. § 113(a)(4) (Count Seven).   The government also agreed to dismiss all other remaining charges as a result of his guilty plea.   (Counts One, Three, Four, Five, Six, and Eight).

As in every January 6th case, the government has conducted a thorough investigation into Mr. Byerly's actions.   That investigation has established that the police officer that is the victim in Count II did not require medical treatment, nor did the officer sustain injuries that caused the officer to miss work.   The AP reporter that is the victim in Count Seven was not injured and advised the government that he did not wish to participate in the investigation of this matter.

The government's investigation confirmed that Mr. Byerly did not enter the United States Capitol, nor did he author or post any inflammatory social media or text messages either before or after January 6, 2021.   The government's investigation also determined that Mr. Byerly was

not a member of an antigovernment militia.

Regarding the device Mr. Byerly brought with him to Washington, D.C., the government's investigation established Mr. Byerly purchased the device at a Cabela's Store for $24.99 and the packaging described it as a compact stun gun and flashlight.   The government's investigation also determined that the device was considered "junk" by engineering experts who work on TASER weapons.

The defense retained electrical engineer Mark Kroll, Ph.D., to examine and test the device.   Dr. Kroll is a recognized expert in the field of conducted electrical weapons, which deliver an electrical pulse to the body.   Dr. Kroll has been retained and presented as an expert in federal court by Department of Justice prosecutors on numerous occasions to testify about the effects of conducted electrical weapons such as TASER's and stun guns.   After a thorough review, Dr. Kroll concluded that Mr. Byerly's device could not cause deadly harm or for that matter any harm to an individual.   Furthermore, shortly after purchasing the device, Mr. Byerly had accidentally activated it on himself and thus knew that it could not cause injury or even pain.

Mr. Byerly has been incarcerated since the day of his arrest in this matter – July 7, 2021 – a total of 15.5 months.   He has remained misconduct-free during that entire time.   During those 15.5 months he has lost his house and because of COVID-19 restrictions, as well as the distance between where he has been incarcerated and his hometown, he has had no in-person visits with any family or friends.

The defense and the government agree that the advisory guideline range is 37-46 months. The defense respectfully requests that this Court recognize and weigh the good that Mr. Byerly has done in his 55 years of life along with the mistakes he made on January 6th and vary below

2

the guidelines and impose a sentence sufficient – but not greater than necessary – given the

nature of the offense and Mr. Byerly' personal history and characteristics.   *United States v.*

*Booker*, 543 U.S. 220 (2005).

## I.   PROCEDURAL HISTORY

On July 7, 2021, Alan Byerly was arrested at his home in Fleetwood, Pennsylvania and

charged by Complaint and Warrant with participating in the riot at the United States Capitol on

January 6, 2021.   Specifically, the Complaint alleged that Mr. Byerly had assaulted a police

officer with a deadly weapon, namely a TASER, in violation of 18 U.S.C. § 111(b).   The

Complaint also alleged that Mr. Byerly had assaulted an AP reporter in violation of 18 U.S.C.

§ 113(a)(4).   The Complaint also contained several lesser included offenses.

On August 12, 2021, Mr. Byerly stipulated to pre-trial detention pending the resolution of

this matter.   As a result of this stipulation, Mr. Byerly has been held in continuous federal

custody since the date of his arrest.   He was initially held at Lehigh County Jail in Allentown,

Pennsylvania for two weeks and thereafter at the CTF in Washington, D.C.   During that entire

time, he has had no write-ups and has remained misconduct-free. And during his 15-plus months

at the CTF Mr. Byerly has been held in administrative segregation due to the nature of his

offense.   Furthermore, he has spent numerous weeks on lockdown due to COVID-19 outbreaks

at the jail.

On August 20, 2021, a federal grand jury sitting in the District of Columbia returned an

indictment against Mr. Byerly charging him with eight federal offenses.   Specifically, these

charges were: Count One (Civil Disorder in violation of 18 U.S.C. § 231(a)(3)); Count Two

(Assaulting, Resisting, or Impeding Certain Officers Using a Deadly or Dangerous Weapon in

violation of 18 U.S.C § 111(a) and (b)); Count Three (Entering and Remaining in a Restricted

Grounds Using and Carrying a Deadly or Dangerous Weapon in violation of 18 U.S.C.

§ 1752(a)(1) and (b)(1)(A)); Count Four (Disorderly and Disruptive Conduct in Restricted

Grounds Using and Carrying a Deadly or Dangerous Weapon in violation of 18 U.S.C.

§ 1752(a)(2) and (b)(1)(A)); Count Five (Engaging in Physical Violence in Restricted Grounds

Using and Carrying a Deadly or Dangerous Weapon in violation of 18 U.S.C. § 1752(a)(4) and

(b)(1)(A)); Count Six (Act of Physical Violence on Capitol Grounds in violation of 40 U.S.C.

§ 5104(e)(2)(F)); Count Seven (Striking, Beating, and Wounding within the Territorial

Jurisdiction of the United States in violation of 18 U.S.C. § 113(a)(4)); and Count Eight (Simple

Assault within the Territorial Jurisdiction of the United States in violation of 18 U.S.C.

§ 113(a)(5)).

The original indictment described the deadly weapon possessed by Mr. Byerly as a

TASER. *See* Indictment, *United States v. Alan Byerly*, 1:21-CR-527-RDM, Doc. 18 at 2 (Aug.

20, 2021).   Thereafter, the government filed two superseding indictments. *See* Indictment,

*United States v. Alan Byerly*, 1:21-CR-527-RDM, Doc. 24 (Oct. 19, 2021); Indictment, *United

States v. Alan Byerly*, 1:21-CR-527-RDM, Doc. 39 (March 23, 2022).   In each of these

superseding indictments the government continued to allege that the deadly or dangerous weapon

that Mr. Byerly possessed was a TASER.   *See* Doc. 24 at 2, Count Two; Doc. 39 at 2, Count

Two.

On March 24, 2022 – the day after the Second Superseding Indictment was filed – the

defense provided the government with the expert report from electrical engineer Dr. Mark Kroll.

This report, detailed below in Section III.A.1, described the results of the testing Dr. Kroll had

done on the device the parties agree Mr. Byerly used on January 6th.   Thereafter, the government agreed to the terms of a plea agreement wherein Mr. Byerly would plead guilty to Counts Two and Seven and the government would drop the more serious charge under 18 U.S.C. § 111(b) that alleged Mr. Byerly possessed a deadly or dangerous weapon.   The government also agreed the device was not a TASER but rather was best described as a "stun gun" based on its packaging.   *See* Statement of Offense, *United States v. Alan Byerly*, 1:21-CR-527-RDM, Doc. 44 (July 25, 2022) at 3, ¶ 9; *id.* at 5 ¶ 13.

The parties also agreed that the applicable advisory guideline range was 37-46 months but that both parties could "seek a variance and suggest that the Court consider a sentence outside of the applicable Guidelines Range . . .."   *See* Plea Agreement, *United States v. Alan Byerly*, 1:21-CR-527-RDM, Doc. 43 at 5, ¶ 5 (July 25, 2022).

On July 25, 2022 Mr. Byerly appeared before this Court and in accordance with the plea agreement entered a guilty plea to Counts Two and Seven of the Second Superseding Indictment. As part of the written plea agreement between the government and the defense, Counts One, Three, Four, Five, Six, and Eight will be dismissed at the time of sentencing.

Sentencing in this matter is scheduled before this Court on October 21, 2022.

## II.   THE APPLICABLE SENTENCING GUIDELINES

As noted above, the defense and the government agree as to the advisory guideline range set forth in the Presentence Investigation Report for the offenses of conviction.   Count Two is punishable by not more than eight years of incarceration and is considered a Class D felony. Count Seven is punishable by not more than one year incarceration and is considered a Class A misdemeanor.   *See* 18 U.S.C. § 3559(a).

Specifically, as to Count Two, it is agreed that the Base Offense level is 14. *See* Presentence Investigation Report, *United States v. Alan Byerly*, 1:21-CR-527-RDM, Doc. 48 at 10, ¶ 41 (Oct. 13, 2022).   It is also agreed that the offense level is increased by four levels because a "dangerous weapon" was otherwise used.  *Id.* at ¶ 42.   The defense and the government agree that the offense level is increased six levels because the victims were government officers.   *See* PSR, Doc. 48 at 10, ¶ 43. Therefore, it is agreed that the Adjusted Offense Level for Count Two is 24. *See id.* at ¶ 27.

Importantly, Mr. Byerly did not possess a deadly weapon that could actually harm or incapacitate anyone.   Rather, as detailed below in Section III.B., the device he possessed qualifies as a "deadly weapon" under the Sentencing Guidelines *only* because the Commentary to the applicable guidelines greatly expands the definition of deadly weapon to include *anything* that is not capable of causing harm but "closely resembles such an instrument" or "was used in a manner that created the impression that the object was such an instrument".   *See* U.S.S.G. § 1B1.1 cmt. n.1(E)(ii)(II).   In other words, Mr. Byerly will receive the same four-level upward enhancement for possessing a fake weapon as would another individual who possessed a real weapon such as a loaded gun.

The defense and the government agree as to Count Seven that the Base Offense Level is 7.   *See id.* at ¶ 47.   It is also agreed that there are no offense specific increases under the guidelines applicable to Count Seven.   *See id.* at ¶¶ 48-51.

Both the defense and the government agree that the Adjusted Offense Level is decreased by three levels because Mr. Byerly clearly demonstrated acceptance of responsibility for the offense and timely notified the authorities of the intention to enter a plea of guilty.   *See id.* at 11,

¶¶ 58-59.   Finally, it is agreed that the Total Offense Level for Counts Two and Seven is 21. *See id.* at ¶ 60.

The defense and the government agree that Mr. Byerly's criminal history score is zero. Therefore, his prior criminal history places him in Criminal History Category I.   *See id.* at 14, ¶ 65.

The defense and the government agree that the advisory guideline range is 37 to 46 months. If the four-level enhancement for possession of a "deadly weapon" were not included, then the applicable guideline range would be 24 to 30 months.

It is the defense position that the Court could consider this disparity, in and of itself, as grounds supporting a variance.   For this reason and for the additional reasons set forth herein the defense requests that this Court vary below this advisory range and impose a sentence that is sufficient but not greater than necessary.

**III.    A VARIANCE UNDER 18 U.S.C. § 3553(A)(1) ACCOUNTING FOR THE NATURE AND CIRCUMSTANCES OF THE OFFENSE IS EQUITABLE AND CONSISTENT WITH THE PLAIN, UNAMBIGUOUS LANGUAGE OF THE SENTENCING GUIDELINES BECAUSE THE DEVICE MR. BYERLY POSSESSED ON JANUARY 6 WAS NOT IN FACT A WEAPON THAT COULD CAUSE INJURY.**

The parties have agreed that the four-level enhancement for "dangerous weapon" under U.S.S.G. § 2A2.2(B) applies.   *See* Plea Agreement, *United States v. Byerly*, 1:21-CR-527-RDM, Doc. 43 at 3 (June 15, 2022).   But the parties have also agreed that Mr. Byerly can argue for a variance. *See id.* at 5.

A variance is appropriate here because the device that Mr. Byerly used on January 6, 2021, could not harm anyone, as Mr. Byerly's expert electrical engineer as well as engineers consulted by the government agree.   Indeed, the government's investigation has correctly

determined that Mr. Byerly's device was "junk."

Still, the four-level enhancement applies here, but only because the Commentary applicable to the enhancement greatly expands the normal meaning of a "dangerous weapon" to include any devices that are not dangerous or deadly but that are used in a manner that creates an impression that the device is dangerous or deadly.   *See* U.S.S.G. § 1B1.1 cmt. n.1(E)(ii)(II). Once Mr. Byerly activated his device – which he bought for $24.99 at a Cabela's Store – it made a loud buzzing noise that caused the officers nearby to shout "TASER, TASER, TASER." Statement of Offense, *United States v. Alan Byerly*, 1:21-CR-527-RDM, Doc. 44 at 4-5 (July 25, 2022).

Undoubtedly, Mr. Byerly's actions created a false impression that his harmless device was dangerous and the loud noise understandably instilled fear in the officers.   This is a valid consideration when this Court analyzes the nature and circumstances of the offense.   But a fair accounting for this factor should not result in the same four-level enhancement that a defendant with an actual dangerous weapon receives.

This "dangerous weapon" enhancement adds up to 16 months to Mr. Byerly's sentencing guideline range, increasing the range from 24-30 months to 37-46 months.   Despite having a cheap piece of "junk" that could not harm anyone, Mr. Byerly could still get the same four-level enhancement as a January 6th defendant who assaulted a law enforcement officer with a loaded gun, a knife, chemical spray, or another actually dangerous weapon.   A variance is appropriate to account for the actual nature of the weapon Mr. Byerly used on January 6, 2021, consistent with the unambiguous language in the controlling Sentencing Guideline.

A.     **Mr. Byerly's Device was Not in Fact Dangerous or Deadly.**

1.     **Scientific testing by an electrical engineer, corroborated by relevant engineers with whom the Government consulted, shows Mr. Byerly's device was harmless.**

The parties agree that Mr. Byerly had a Mace Brand "compact stun gun" at the Capitol on January 6th.   They also agree that Mr. Byerly purchased the device at a Cabela's Store in Pennsylvania.   The device, which was displayed on a shelf in the store's camping section, cost $24.99.   *See* Attachment 1.   The device looks like a flashlight and has an operable flashlight at one end.   Indeed, one of the law enforcement officers who interviewed Mr. Byerly upon his arrest on July 7, 2021 described the device as resembling a flashlight.   While the device's packaging says, "compact stun gun" and the body of the device says, "stun light," it is a stun gun in name only.

Counsel for Mr. Byerly retained electrical engineer Mark Kroll and asked him to purchase and conduct electrical testing on a Mace Brand "compact stun gun."   Because the actual device Mr. Byerly had was not preserved by the government, Dr. Kroll tested two samples of the same device the parties agree Mr. Byerly used on January 6th.

Dr. Kroll is a biomedical scientist with a Ph.D. in electrical engineering.   His primary specialty is the interaction of electricity and the body; he has spent most of his career researching the effect of electrical shocks on the human body.   With over 380 issued United States' patents and numerous pending and international patents, Dr. Kroll currently holds the most patents on electrical medical devices of anyone in the world.   He has published over 100 relevant papers and two books on conducted electrical weapons.   Dr. Kroll has been qualified as an expert in numerous courts and has been retained by, and testified for, the Department of Justice on

multiple cases involving electrical weapons.   *See* Expert Report and Curriculum Vitae of Mark Kroll, *United States v. Alan Byerly*, 1:21-CR-527-RDM, March 24, 2002, at 4 (Attachment 2) ("Kroll Report").

To measure the electrical output of the Mace Brand device, Dr. Kroll conducted multiple electrical tests on two samples of the device using accepted medical and scientific safety limits for electrical devices.   Based on that testing, Dr. Kroll concluded that Mr. Byerly's device could not cause any muscle effects.   *Id.* at 11.   Dr. Kroll further found that "the MACE contacts are so close that they would only have a skin effect as the current would not be able to dive down deep enough to affect the muscles regardless of the amount of current."   *Id.*   Dr. Kroll also specifically tested the device using electrical standards for stun guns and found that the Mr. Byerly's device fell 98% short of the minimum output requirements of an actual stun gun. *Id.* at 12-13.

Dr. Kroll also compared the results of his testing to the claims Mace Brand makes in its advertising about the device, including the assertion that it produces an electrical shock up to 7.6 microcoulombs, and the assertion that the shock can cause physical and mental impacts.   Dr. Kroll found that the advertising claims are exaggerated and demonstrably false.   *Id.* at 14.   Dr. Kroll found that the primary effects of Mr. Byerly's device are auditory and visual, which is consistent with the officers' response when Mr. Byerly turned on the device.   *Id.*

Dr. Kroll ultimately concluded to a reasonable degree of scientific certainty that the device Mr. Byerly used on January 6, 2021, cannot be used in a manner likely to produce death or serious bodily injury.   *Id.*   This is because the device "cannot cause injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or

protracted loss or impairment of the function of a bodily member, organ, or mental faculty."   *Id.*

And Dr. Kroll is not giving this opinion in a vacuum.   Rather, the government has corroborated Dr. Kroll's opinion.   A government witness spoke with engineers at Axon, manufacturer of the TASER weapon.   Those engineers "described the [Mace Brand] device as a low charge weapon that would not likely incapacitate anyone as the electrical charge could not override the central nervous system.   The engineers also called the weapon 'junk.'"   Interview of David Wright, FBI-302 (Feb. 18, 2022) (Attachment 3) ("FBI-302").

The government provided the defense with an interview summary from David Wright, a former police officer and gym owner who alleged without any scientific support that Mr. Byerly's device could cause severe pain and serious harm.   *Id.*   Without any testing, Mr. Wright accepted the manufacturers' debunked claim on the packaging that the device emits a shock of 7.6 microcoulombs and then based his claim of "pain" specifically on that.   *Id.* at 1-2.   Such an assertion lacks sufficient indicia of reliability under U.S.S.G. § 6A1.3(a).   *See United States v. Harris*, 44 F.3d 1206, 1216 (3d Cir. 1995) (relying on U.S.S.G. § 6A1.3(a) and holding that Government witness' testimony that defendant's chemical spray could cause serious bodily injury lacked reliability because it was based on manufacturer's "promotional literature").   Still, Mr. Wright conceded that the device is "unlikely" to incapacitate anyone.   *Id.*

This Court should resolve any dispute between the parties over "dangerous weapon" by crediting the opinion of Dr. Kroll, who tested the device electrically and whose opinion is corroborated by engineers contacted by the Government, over the unreliable claims of Mr. Wright, who is not an engineer and who relied on packaging assertions over actual testing and disregarded the opinions of relevant, independent engineers.   Given the opinions of Dr. Kroll

and the TASER engineers, the device Mr. Byerly used on January 6th was not in fact a "dangerous weapon."

> **2.  The Government's argument that Mr. Byerly's device was dangerous is legally and factually incorrect.**

The government attempts to preempt Mr. Byerly's request for a variance by arguing that his device "meets the definition of a dangerous weapon." Government Sentencing Memorandum, *United States v. Alan Byerly*, 1:21-CR-527-RDM, Doc. 47 at 28 (October 9, 2022). The government's effort lacks any scientific basis, misreads the cases they cite, ignores their own witness's opinion, and mischaracterizes Mr. Byerly's argument.

Without any citation or support, the government asserts that Mr. Byerly's device is "dangerous" because it is "capable of inflicting serious bodily injury." *Id.* This argument ignores the electrical testing conducted by Dr. Kroll and his conclusion that, based on that testing, Mr. Byerly's device could not cause extreme physical pain or impairment in functioning. The Government's argument also ignores that their own counter witness, Mr. Wright, believes that Mr. Byerly's device "will not likely incapacitate a person." FBI-302 at 1 (Attachment 3). And this is the same witness who was told by TASER engineers that Mace Brand device Mr. Byerly used is "junk." *Id.* Given these opinions, the government's blanket assertion of dangerousness is meritless.

The government also asserts that courts have held that a stun gun is a dangerous weapon. But as detailed above, the device Mr. Byerly used was advertised as a stun gun but was not actually harmful. The three cases the government cites are distinguishable from Mr. Byerly's situation, primarily because the government cannot show that the weapons at issue in these cases are similar in their electrical power to the device Mr. Byerly used on January 6th.

The opinion in *United States v. Agron*, 921 F.2d 25 (2d Cir. 1990), is silent as to both the model of stun gun at issue and its electrical charge capabilities but the defendant did not dispute that what he possessed could temporarily incapacitate an individual.   *Id.* at 26.   The Second Circuit found that that incapacitation was a sufficient impairment to satisfy the Guidelines' "dangerous weapon" language.   *Id.* By contrast, Mr. Byerly disputes that his device could cause anyone any harm.

The opinion in *United States v. Wallace*, 800 F.2d 1509 (9th Cir. 1986), also is silent as to both the model of stun gun at issue and its electrical charge capabilities but "evidence was introduced at trial indicating that stun guns may cause permanent injury to the eyes and that a single stun gun may incapacitate twenty to forty people at a time."   *Id.* at 1513. By contrast, the government's witness believes that Mr. Byerly's device is unlikely to incapacitate anyone, an opinion shared by Dr. Kroll and the TASER engineers with whom Mr. Wright consulted.

And in *United States v. Quiver*, 805 F.3d 1269 (10th Cir. 2015), the court examined an actual TASER Brand model in drive-stun mode. The opinion does not describe the electrical capacity of the TASER in that mode but held that, in that mode, the weapon could cause "serious bodily injury," *id.* at 1272, which Mr. Byerly's device cannot.   It is irrelevant that the TASER model in *Quiver* was found to be a dangerous weapon in drive-stun mode when assessing the non-dangerous device that Mr. Byerly had.   Indeed, Axon engineers, who should be familiar with the TASER model at issue in *Quiver* because they work for the company that makes TASERS, did not tell government witness Mr. Wright that Mr. Byerly's device was like a TASER in drive-stun mode but rather told him that it was "junk." The Court should not rely on the government's apples-to-oranges comparisons from the cases they reference.

13

Like its witness Mr. Wright, the government also relies on the Mace Brand website and the warning label on the packaging describing the device Mr. Byerly had to assert it is dangerous.   *See* Doc. 47 at 28-29 and Exhibit 12.   But unlike Dr. Kroll, the government did not have anyone test the accuracy of the website and packaging claims.   Dr. Kroll specifically debunked each claim, including that: the device can cause minor muscle contractions, spasms, a dazed mental state, loss of balance, loss of muscle control; and the device can deliver an electrical charge of 7.6 microcoulombs, on which Mr. Wright specifically relies for his assertion of pain and which exaggerates the actual charge by a factor of 10.   *See* Kroll Report, at 9-11, 14 (Attachment 2).

Certainly, the manufacturer's packaging labels what Mr. Byerly had a "compact stun gun," *see* Attachment 1, but that label is not valid evidence of the device's actual dangerousness. The packaging and website claims that Mace Brand makes for purposes of boosting sales and insulating itself from potential legal liability should not control over the actual capacity of the device, which is negligible.   In *United States v. Rene Perez*, 519 Fed. App'x 525 (11th Cir. 2013), the Government relied on the packaging warning label and brand name of the defendant's pepper spray to argue that it was a "dangerous weapon" for purposes of Guidelines enhancement. *Id.* at 528.   The Eleventh Circuit rejected that argument, holding that "[n]either a brand name nor a warning label, alone or taken together, establish that a weapon is a 'dangerous weapon' under the Guidelines."   In reaching that conclusion, the appellate court held that "a label created by the manufacturer of a substance is not particularly reliable evidence given its self-serving nature."

14

The Third Circuit reached a similar conclusion in *United States v. Harris*, where it relied on U.S.S.G. § 6A1.3(a) and held that the description of Mace spray in a manufacturer's "promotional literature" did not provide a reliable basis to support the district court's finding that the chemical spray at issue was a dangerous weapon because the manufacturer's claim of "extreme discomfort" was "self-serving." *Harris*, 44 F.3d at 1216.

The same holds true here.   Under Guideline § 6A1.3(a), the Court should not credit the Mace Brand packaging and website because those self-serving materials lack "sufficient indicia of reliability to support [their] probable accuracy," particularly considering the scientific opinions of Dr. Kroll and the government's consulting engineers and the absence of any scientific testing by a government witness.

Finally, the government asserts that the defense "seemingly concedes" that Mr. Byerly's device is a dangerous weapon because counsel suggested in plea negotiations that Guideline § 2A2.4 should apply to Mr. Byerly's case.   *See* Doc. 47 at 28.   Mr. Byerly never conceded that the device was dangerous and merely suggested § 2A2.4 as a Guideline that would result in a lower offense level for Mr. Byerly.   And the subpart cited by the government, § 2A2.4(b)(1)(B), specifically states "[*i*]f a dangerous weapon" was involved, which means that a finding needs to be made, not that a weapon is automatically dangerous. Further, the parties have agreed that Guideline § 2A2.2 is the controlling sentencing guideline.   *See* Doc. 43 at 3.   And applying § 2A2.2 here is consistent with what judges on this Court have found in other January 6th assault on law enforcement officer cases.   *See*, *e.g.*, Sentencing Hearing Transcript, *United States v. Creek*, 1:21-CR-645-DLF, Doc. 61 at 11-12 (May 2, 2002) (concluding § 2A2.2 is relevant guideline and not § 2A2.4 and citing *United States v. Languerand*, 1:21-CR-353-JDB, and

15

*United States v. Leffingwell*, 1:21-CR-5-ABJ, as having reached similar conclusions).

> **B.    Because the Commentary to the Text of Guideline § 2A2.2 Unduly Expands the Plain, Unambiguous Meaning of the Term "Dangerous Weapon," the Court Should Not Give Deference to the Commentary in Considering Mr. Byerly's Request for a Variance Based on the Harmless Nature of His "Junk" Device.**

Although Mr. Byerly's device could not harm anyone, he is still subject to a four-level "dangerous weapon" enhancement only because the Commentary to the applicable Guideline, § 2A2.2(b)(2)(B), inconsistently expands the plain, unambiguous meaning of "dangerous weapon" to include objects that are not actually dangerous or deadly but that are used in a manner that creates an "impression" that the device is dangerous or deadly.   *See* U.S.S.G. § 1B1.1 cmt. n.1(E)(ii)(II).   In other words, under the Commentary, a fake dangerous weapon morphs into a real dangerous weapon.   As a legal matter, that interpretation is entitled to no deference and supports the defense's argument for a variance.

Under *Stinson v. United States*, 508 U.S. 36 (1993), if Commentary is inconsistent with a Guideline, the Guideline prevails. *Id*. at 38, 40.   Relying on this principle, in *United States v. Winstead,* 890 F.3d 1082 (D.C. Cir. 2018), the District of Columbia Circuit held that because the Commentary to Guideline § 4B1.1 impermissibly expanded the definitions of "controlled substance offense" and "crime of violence" to include attempt offenses, the Commentary was inconsistent with the Guideline and thus could not carry weight at sentencing.   *Id.* at 1090-92. The Third Circuit and the Seventh Circuit have specifically agreed with *Winstead's* conclusion about disregarding Commentary that conflicts with the plain text of the Guidelines. *See United States v. Nasir*, 17 F.4th 459, 471–72 (3d Cir. 2021) (relying on *Winstead* to rule that Guideline § 4B1.2(b) does not include attempt crimes); *United States v. Havis*, 927 F.3d 382 (6th Cir. 2019)

(en banc) (applying *Winstead* to hold that definition of "controlled substance offenses" in Guideline § 2K2.1(a)(4) does not include attempt crimes contained only in the Commentary).

In *United States v. Davis*, 635 F.3d 1222 (D.C. Cir. 2011), the District of Columbia Court of Appeals relied on the Commentary to hold that it was proper to apply the enhancement for brandishing a "dangerous weapon" during a robbery under Guideline § 2B3.1 to a defendant who mimicked having a gun during a bank robbery. *Id.* at 1224-25. Because the *Davis* Court did not address the argument the controlled in *Winstead* about an inconsistency between the Commentary and the relevant Guideline, that ruling should be limited to the "dangerous weapon" enhancement as applied to robbery offenses, such as bank robberies in violation of 18 U.S.C. § 2113(a). *See United States v. Tate*, 999 F.3d 374, 381 (6th Cir. 2021) (limiting holding in bank robbery case where defendant pretended to have a gun to robbery offenses and noting that "[c]ases arising with respect to different facts or different laws could dictate a different result.").

And other Circuit Courts of Appeals recently have questioned the application of Commentary that broadens the ordinary meaning of unambiguous Guideline terms. *See United States v. Campbell*, 22 F.4th 438, 444-47 (4th Cir. 2022) (rejecting application of Commentary that is "plainly" inconsistent with the unambiguous text of the relevant Guideline) (relying on *Stinson* and *Kisor v. Wilkie*, 139 S.Ct. 2400, 2415 (2019)); (holding that the Commentary should only get deference if the plain language of the Guideline is "genuinely ambiguous.") (quoting *Kisor*, 139 S.Ct. at 2415); *United States v. Nasir*, 982 F.3d 144, 158-60 (3d Cir. 2020) (en banc); *United States v. Nasir*, 17 F.4th 459, 471-72 (3d Cir. 2021) (en banc) (same).

This plain-text approach is important because the Commentary to the Guidelines, unlike the Guidelines themselves, "never passes through the gauntlets of congressional review or notice

and comment," and thus the Commentary "has no independent legal force."   *Havis*, 927 F.3d at

(citing *Stinson*, 508 U.S. at 44-46).   Because the Commentary has no independent legal force,

"separation-of-powers concerns advise against any interpretation of the Commentary that

expands the substantive law set forth in the guidelines themselves." *Nasir*, 982 F.3d 144, 159 (3d

Cir. 2020); *accord Havis*, 927 F.3d at 386 (a court may not rely on a Commentary note that

inconsistently expands the scope of the corresponding Guideline).   Here, the plain language of

Guideline § 2A2.2(b)(2)(B) is not genuinely ambiguous. Rather, the ordinary meaning of

"dangerous" is "able or likely to cause harm or injury."   "Dangerous." *Merriam-Webster.com*

*Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dangerous.   *See*

*also* WEAPON, Black's Law Dictionary (11th ed. 2019) ("dangerous weapon. (17c) "An object

or device that, because of the way it is used, is capable of causing serious bodily injury.").

The Commentary's definition of "dangerous weapon" to include an object that only can

create an impression of dangerousness but that is incapable of causing harm or injury is a

fictional dangerousness that is contrary to the commonsense definition of dangerous weapon.

No reasonable person would define "dangerous" to include something that merely appears

dangerous but is not capable of inflicting any harm or injury; indeed, an object not capable of

causing injury is inconsistent with an object that is capable of inflicting injury.

Because an object that merely creates an "impression" of dangerousness does not make

the object actually dangerous, the Commentary here – which is the only basis for the four-level

enhancement here – results in an unusual impression that would expand the clear scope of

Guideline § 2A2.2(b)(2)(B).   But *Stinson* "requires that Commentary interpret the guidelines,

not contradict or add to them." *Riccardi*, 989 F.3d at 493 (6th Cir. 2021) (Nalbadian, J.,

18

concurring in part and in the judgment); *accord Stinson*, 508 U.S. at 40, 43.   The Commentary's incorporation of harmless objects is a broad expansion of "dangerous weapon" that conflicts with and extends well beyond the plain and unambiguous language of Guideline § 2A2.2(b)(2)(B). As such, the Commentary acts as an enhanced punishment rather than an assessment of dangerousness based on the nature and circumstances of Mr. Byerly' offense, which is contrary to *Stinson* and further support for a variance here.   *See*, *e.g.*, *United States v. Kirilyuk*, 29 F.4th 1128, 1138 (9th Cir. 2022) (holding that because Commentary to the § 2B1.1 theft Guideline calculating loss as $500 per stolen credit card expands the meaning of "loss" and is "clearly inconsistent with the language of the Guideline," the Commentary "is not binding under *Stinson.*").

The government's argument that its 46-month sentence recommendation is justified under § 3553 because it is within the Guidelines approved by Congress only reinforces that no deference is due to the Commentary here. *See* Government Sentencing Memorandum, Doc. 47 at 37-38.   The relevant Guideline approved by Congress plainly addresses actual "dangerous weapons" and not the fake "dangerous weapons" covered only by the Commentary lacking Congressional approval.   If the Court were to apply the plain text of the Guidelines here and not the Commentary, Mr. Byerly's advisory guideline range would be 24 to 30 months.   Under *Stinson* and the separation-of-powers concerns addressed above, this scenario in which there is a plain, unambiguous Guideline and an expansive, inconsistent Commentary requires application of the Guideline not the Commentary.

The Court should not defer to Commentary that "strays too far from the Guideline that it claims to interpret."   *United States v. Perez*, 5 F.4th 390, 403 (3d Cir. 2021) (Bibas, J.,

concurring).   Rather, Commentary that expands the reach of an otherwise clear Guideline deserves no deference.   A variance is appropriate here to ensure that the overly broad definition of "dangerous weapon" in the Commentary does not trump the plain and unambiguous language of Guideline 2A2.2(b)(2)(B).   Otherwise, Mr. Byerly will be sentenced with the same four-level enhancement that would add up to 16 months to his guideline range as January 6th defendants who used actual dangerous weapons. Such a sentence is not fair or equitable and the Court should not "impose such a massive impact on a defendant with no grounding in the guidelines themselves." *Winstead*, 890 F.3d at 1092.

**IV.   A VARIANCE IS WARRANTED UNDER 18 U.S.C. § 3553(A)(6) TO AVOID UNWARRANTED SENTENCING DISPARITIES BETWEEN MR. BYERLY AND OTHER JANUARY 6TH DEFENDANTS.**

Imposing the 46-month sentence the government requests would result in unwarranted sentence disparity.   A variance is equitable to avoid unwarranted sentencing disparities between Mr. Byerly and other similarly situated defendants.   This includes January 6th defendants who have been convicted of more serious charges – with higher guidelines -- than Mr. Byerly, such as assault on law enforcement officers with an actual dangerous or deadly weapon under 18 U.S.C. § 111(b) or obstruction of an official proceeding 18 U.S.C. § 1512(c) – both of which are Class C felonies – but who have received sentences shorter or equal to the 46-month sentence the government requests here.   This also includes January 6th defendants who were convicted of the same Class D felony as Mr. Byerly under 18 U.S.C. § 111(a).

**A.    January 6th Defendants who Have Been Convicted of More Serious Charges than Mr. Byerly Have Received Sentences Shorter than What the Government has Requested in Mr. Byerly's Case.**

In the following cases, January 6th defendants convicted of more serious charges – with higher guidelines -- than Mr. Byerly have been sentenced *to less than* what the government recommends here:

**(1)    *United States v. Matthew Miller*, 1:21-CR-75-RDM**

This Court imposed a 33-month sentence on Mr. Miller, a criminal history Category I defendant with a 41-to-51-month guideline range who pled guilty to a § 111(a)(1) assault on multiple law enforcement officers as well as a § 1512(c)(2) obstruction charge.   While the Court is certainly familiar with the facts of Mr. Miller's conduct, it is still important to Mr. Byerly's variance argument based on § 3553(a)(6) argument that he recounts a few of the most relevant facts.

Mr. Miller committed an assault on law enforcement officers guarding the Capitol's Lower West Terrace tunnel.   In sentencing Mr. Miller, the Court indicated that "there was [not] any portion of the assault on the Capitol that was as dangerous as the assault that took place on the tunnel on the Lower West Terrace, with the law enforcement officers in that space trying to protect the Capitol from attack."   Transcript of Sentencing, *United States v. Miller*, 1:21-CR-75-RDM, Doc. 73 at 69 (May 23, 2022).   These officers "were the only barrier between this mass of people, who were inflamed beyond belief, and the United States Capitol and the members [of Congress], including members who were a couple dozen feet away inside the Capitol building." *Id.* at 52.

Specifically, Mr. Miller threw batteries at police officers stationed in the Lower West Terrance tunnel and then discharged the contents of a fire extinguisher directly onto the officers. As a result, numerous officers started coughing and wheezing and gave up their positions (NT at 70); some of the officers had their skin and eyes burned from the fire extinguisher discharge. *Id.* at 73. Based on the "example" Mr. Miller "created," someone else then further assaulted officers with the fire extinguisher. *Id.* at 70.

And the Court found that Mr. Miller was a particularly active participant in creating the danger to the officers and Congress members because he chanted "one, two, three, heave-ho, heave-ho," *id.* at 73, to "coach[]," encourage and "inflame[]" "a mob of people [to] push[] back and forth to crush these officers who were in the tunnel." *Id.* at 51, 53.

**(2)** ***United States v. Scott Fairlamb*, 1:21-CR-120-RCL**

The court imposed a 41-month sentence on Mr. Fairlamb, a criminal history Category I defendant with a 41-to-51-month guideline range who pled guilty to § 111(a)(1) assault on a law enforcement officer as well as a § 1512(c)(2) obstruction charge. Mr. Fairlamb, a former Mixed Martial Arts fighter, shoved a Metropolitan Police Department officer defending the Capitol and then punched the officer's face shield. *See* Government's Sentencing Memorandum, *United States v. Fairlamb*, 1:21-CR-120, Doc. 50 at 1-2 (Nov. 3, 2021). After January 6th, Mr. Fairlamb, "filmed a chilling video threatening future violence, stating, "they pulled the pin on the grenade, and the blackout is coming. What a time to be a patriot," and, immediately after being visited by FBI agents on January 15, 2021, said that he would 'go again' to the U.S. Capitol." *Id.* at 2.

Mr. Fairlamb also incited the crowd to cause mayhem, hurled insults at law enforcement officers, and was one of the first people to enter the Capitol after the windows were smashed. *Id.* at 30.

**(3)   *United States v. Devlyn Thompson*, 1:21-CR-461-RCL**

The court imposed a 46-month sentence on Mr. Thompson, a criminal history Category I defendant with a 46-to-57-month guideline range who pled guilty under 18 U.S.C. § 111(b). to assaulting a law enforcement officer with a baton, a dangerous weapon.

Mr. Thompson, like Mr. Miller, engaged in violence against officers defending the Lower West Terrace tunnel.   Mr. Thompson assisted the mob by helping take riot shields from the law enforcement officers blocking the doorway to the Capitol, which "enable[ed] other members of the mob to assault the officers with greater effect."   *See* Government's Sentencing Memorandum, *United States v. Thompson*, 21-cr-461-RCL, Doc. 30 at 18 (Dec. 13, 2021). Later, Mr. Thompson passed the stolen shields forward for rioters to use against the officers.   *Id.* at 18-19.   He also "joined in [an] effort by the mob to jointly push together against the front-line officers to force their way through the police," creating significant pressure on the front line.   *Id.* at 21.   Thompson also helped fellow rioters throw a large audio speaker toward the police line. *Id.*   Finally, Thompson found a metal baton in the tunnel, made his way to the front of the tunnel where the police line was, and struck once at a law enforcement officer, hitting that officer in the hand.   *Id.* at 23-26.   Overall, for more than 13 minutes, "[Mr.] Thompson was in the tunnel zone and was actively assisting, aiding, and abetting the mob that was assaulting officers and trying to break through the police line to gain access to the Capitol Building" in what the government called the "Battle for the Lower West Terrace Doors."   *Id.* at 12.

23

Here, the government cites this case as supporting its sentencing request, *see* Doc. 47 at 41, but Mr. Thompson's conduct on January 6th was far more egregious than Mr. Byerly's. First, Mr. Thompson was convicted of a § 111(b) assault because, unlike Mr. Byerly, he used an actual dangerous weapon, a metal baton.   Second, the assault was in the Lower West Terrace tunnel, making it part of the most dangerous assault on the Capitol as this Court noted in *Miller*. Mr. Byerly was never in that tunnel.   Third, the length of the criminal conduct is much longer in Mr. Thompson's case than in Mr. Byerly's case: Mr. Thompson attempted, "for more than 13 minutes, to violently enter the U.S. Capitol Building. . .."   Government's Sentencing Memorandum, *United States v. Thompson*, 21-cr-461-RCL, Doc. 30 at 33.   Mr. Byerly never tried to enter the Capitol.   Fourth, "[Mr.] Thompson also helped other armed rioters assault officers over and over again, and he helped steal shields from officers and then help the rioters make use of those same shields."   *Id.*

### (4)   *United States v. Nicholas Languerand*, 1:21-CR-353-JDB

The court imposed a 44-month sentence on Mr. Languerand, a criminal history Category I defendant with a 46-to-57-month guideline range who pled guilty under § 111(a) and (b) to assaulting multiple law enforcement officers with a deadly weapon.

Mr. Languerand, like Mr. Miller and Mr. Thompson, engaged in violence against officers defending the Lower West Terrace tunnel.   He "put himself among the front ranks of the rioters" in the tunnel and, for over 10 minutes, repeatedly attacked officers in the tunnel by assaulting them with an assortment of dangerous weapons, including throwing a stolen police riot shield, pieces of wood, sticks, a large orange traffic bollard, a pepper spray container, and a heavy black audio speaker at officers. *See* Government's Sentencing Memorandum*, United States v.*

*Languerand*, 21-CR-353-JDB, Doc. 24 at 12-18 (January 19, 2022).   Mr. Languerand admitted

that "based on the size and weight of the orange bollard and the stick-like objects, and the speed

and force with which they were thrown, they were capable of inflicting serious bodily injury," *id.*

at 17, which makes them dangerous weapon. *Id.* at 34.   He also had a history of violent and

threatening conduct and bragged on social media about his January 6th conduct afterwards,

posting to Instagram that "[his conduct at the Capitol"] felt good" and telling his Instagram

followers that "Violence isn't always the answer but in the face of tyranny violence may be the

only answer" and "Next time we come back with rifles."   *Id.* at 2, 34-37.

     The government cites this case as supporting its sentencing request, *see* Doc. 47 at 40-41,

but this case also involves conduct far more egregious than Mr. Byerly's.   First, Mr. Languerand

was convicted of a § 111(b) assault because, unlike Mr. Byerly, he used multiple, actual

dangerous weapons capable of causing serious bodily injury as he readily admitted.   Second, the

assault was in the Lower West Terrace tunnel, making it part of the most dangerous assault on

the Capitol as this Court noted in *Miller*.   Mr. Byerly was never in that tunnel.   Third, the

length of the criminal conduct is much longer in Mr. Languerand's case than in Mr. Byerly's

case and involves repeated assaults on law enforcement officers with multiple dangerous

weapons.   Fourth, Mr. Languerand bragged on social media that he "was proud to in violence

against law enforcement on January 6, and that he anticipated and welcomed further violence."

*See* Government's Sentencing Memorandum*, United States v. Languerand*, 21-CR-353-JDB,

Doc. 24 at 34-35.   In contrast, Mr. Byerly did not author or post any inflammatory social media

messages either before or after January 6th.   Fifth, in the years right before January 6, 2021, Mr.

Languerand "exhibited a distinct tendency towards threatening and violent conduct."   *Id.* at 35

(quotation marks omitted).   For Mr. Byerly, as the Probation Officer's Sentencing

Recommendation notes, the current case "is his first arrest and criminal conviction in

approximately 18 years."   PSR, Doc. 48 at 12-13, ¶¶ 62-63.

 The government also notes the 63-month sentence for a § 111(b) conviction imposed in

*United States v. Robert Palmer*, 1:21-CR-328-TSC.   *See* Government's Sentencing

Memorandum, *United States v. Byerly*, Doc. 47 at 40.   Mr. Palmer's case is easily distinguished

from Mr. Byerly's case, as even the government's recounting of this January 6th case shows.

First, Mr. Palmer "repeatedly assaulted police officers with a wooden plank and then sprayed

officers with a fire extinguisher, which he later threw at them, while on the Lower West Terrace

of the Capitol."   *Id.*   Like Messrs. Miller, Languerand, and Thompson – but unlike Mr. Byerly

– Mr. Palmer assaulted officers defending the Lower West Terrace tunnel, making his conduct

part of the most dangerous assault on the Capitol as this Court noted in *Miller*.   In a separate

incident, Mr. Palmer also assaulted officers on the Upper West Plaza with a four-to-five-foot-

long pole that he threw at the officers like a spear. *See* Government's Sentencing

Recommendation, *United States v. Palmer*, 1:21-CR-328-TSC, Doc. 30 at 17-18 (Dec. 10, 2021).

Second, Mr. Palmer's "conduct after January 6 disqualified him from the reduction for

acceptance of responsibility under § 3E1.1."   Government's Sentencing Memorandum, *United

States v. Byerly*, Doc. 47 at 40.    Third, Mr. Palmer was convicted of § 111(b) assault because,

unlike Mr. Byerly, he assaulted an officer with a wooden plank and a fire extinguisher, both of

which he admitted were capable of inflicting serious bodily injury, which makes them actual

dangerous weapons.   *See* Government's Sentencing Recommendation, *United States v. Palmer*,

1:21-CR-328-TSC, Doc. 30 at 15-16 (Dec. 10, 2021); Transcript of Sentencing Hearing, *United

26

*States v. Palmer*, 1:21-CR-328-TSC, Doc. 33 at 2-3 (Dec. 17, 2021).

    **B.**    **Sentences for January 6th Defendants Convicted of § 111(a) Assault Support a Variance.**

There are now several January 6th cases that involve a conviction under § 111(a) where the sentencing court imposed a sentence less than 37 months.   These cases clearly support the defense argument for a variance.   *See United States v. Mark Leffingwell*, 21-CR-5-ABJ (government requested 27 months incarceration and defendant received a sentence of 6 months incarceration); *United States v. Kevin Creek*, 21-CR-645-DLF (government requested 27 months incarceration and defendant received 27 months incarceration); *United States v. Ricky Willden,* 1:21-CR-423-RC (government requested 30 months and the defendant was sentenced to 24 months incarceration).

The government points this Court to three January 6th cases in which the defendants were convicted for § 111(a) assaults and received more than 37 months.   *See* Government's Sentencing Memorandum, Doc. 47 at 38-40.   Because these cases are significantly more aggravated than Mr. Byerly's case, they actually support his request for a variance.

    **(1)**    ***United States v. Cody Mattice and James Mault*, 1:21-CR-657-BAH**

Mr. Mault and Mr. Mattice received sentences of 44 months incarceration for convictions under 18 U.S.C. § 111(a).   Their cases are significantly different from Mr. Byerly's case.   First, both men possessed actual deadly and dangerous weapons – a bike rack and chemical spray – and the defense conceded that these items could in fact cause serious bodily injury. Furthermore, the government in its sentencing memorandum in those cases highlighted this very point when it distinguished their actions from other defendants convicted under § 111(a) who did not possess deadly weapons.   *See* Government's Response to Defendants' Sentencing

Memorandum, *United States v. Mault and Mattice*, 1:21-CR-657-BAH, Doc. 64 at 7 (July 6,

2022).   Additionally, both men bragged about and glorified the violence in text messages before,

during, and after the riot.    And most importantly these two defendants were leaders of the

charge into the Lower West Terrace Tunnel, which was the scene of the worst violence, working

their way through dense crowd and crawling over the heads of other rioters to reach the mouth of

the tunnel.  *See* Government's Sentencing Memorandum, *United States v. Cody Mattice and

James Mault*, 1:21-CR-657, Doc. 60 at 20 (June 30, 2022)

       **(2)**       **United States v. Howard Richardson, 1:21-CR-721-CKK**

Mr. Richardson received a sentence of 46 months incarceration for a conviction under 18

U.S.C. § 111(a).   This case is significantly different from Mr. Byerly's case.   First, like Messrs.

Mault and Mattice, Mr. Richardson did not dispute that he possessed and used an actual deadly

weapon.   And he used that deadly weapon (a long flagpole) to bludgeon an officer multiple

times, only stopping when the pole broke.   On January 6th, Mr. Richardson also was out on bail

for illegal possession of a firearm. Then at his change of plea hearing while under oath Mr.

Richardson on at least two occasions lied to the Court about his actions on January 6th.   Further,

after his change of plea hearing – but before his sentencing hearing – Mr. Richardson was

arrested again, this time for aggravated assault.   After that arrest, he lied to the local police

about his conduct, which was captured on video.   *Government's Sentencing Memorandum at

pp.25-28; United States v. Richardson, 21-721 Doc. 35.*

       **(3)**       **United States v. Marshall Neefe, 1:21-CR-567-RCL**

Mr. Neefe received a sentence of 41 months for a violation of 18 U.S.C. § 1512(k). This

case is not comparable to Mr. Byerly's case and in fact supports the defense request for a

variance.   Mr. Neefe pled guilty to a more serious charge than Mr. Byerly.   Section 1512(k) is a grade C felony punishable by up to 20 years in prison. Not surprisingly, Mr. Neefe's guidelines (41-51 months) were higher than Mr. Byerly's guidelines.   Yet he received a sentence five months shorter than the sentence requested by the government here.

## V.   ALAN BYERLY HAS ACCEPTED FULL RESPONSIBILITY FOR HIS ACTIONS AND IS REMORSEFUL FOR HIS CONDUCT.

Alan Byerly is truly remorseful for his actions.   He has pled guilty and accepted full responsibility for what he did.   He knows that pleading guilty is the right thing to do given his actions and he offers this Court no excuse for what he did.   He entered a plea of guilty to the assault on the AP Reporter (Count Seven) knowing that the victim had advised the government that he would not participate in this prosecution.   Regardless, he pled guilty because he knew his actions were wrong.

Attached hereto are character letters that shed light on the type of individual Alan Byerly was and can be again upon his release.   *See* Attachment 4.   He is described as a respectful, kind-hearted, loyal, and caring man.   He is the type of man that is there when your car breaks down or when you need something fixed in the house.   He is a skilled carpenter by trade.   He has always worked to provide for and support his four children.   He takes pride in his family and is a caring and loving father, son, and nephew.   He has not had any contact with the criminal justice system for 18 years; during that time, he worked and lived a productive life.

For the last 15.5 months he has been unable to see any of his family members, whom he misses dearly.   Due to the pandemic, he has spent a significant portion of that time in stark conditions, often going weeks locked down in his cell with minimal time out of the cell.   During that time, he lost his house and upon release will need to move in with his aunt.   He has spent

29

endless hours reflecting on his actions and is determined to better himself in preparation for the day when he will return to his community and family and again be a productive member of society.

The government is correct that in the first few hours after Alan Byerly was initially detained, he minimized his actions on January 6th and denied having the "stun gun" device.   He offers this Court no excuse for this conduct but does apologize for it and accepts full responsibility for it.   As noted by the government in its Sentencing Memorandum he apologized to the law enforcement agents for lying to them.   He also apologized for bringing the device to Washington.

It is important to note that during that same interview he fully admitted that he was present at the riot and truthfully admitted that he had disposed of the hat he wore on January 6th. He then voluntarily gave the agents a detailed and accurate description where in his house they could find and recover all the other clothing he wore on that day including his backpack. He also told them where the keys to his shed were located if they needed to search it.   He also voluntarily gave the agents the passwords to all his password-protected computers.   But to be certain, Alan offers this Court no excuse for the untruthful statements he made and accepts full responsibility for lying.

As he stands before this Court for sentencing Alan Byerly is 55 years old.   He has been in custody now for over a year and three months.   During that time, he has reflected on his ill-conceived actions and the mistakes that he made.   He knows he cannot take back his actions on January 6, 2021.   Yet he is determined to show his family and this Court that he can be a productive member of society again.   He is committed to coming back into society a better

person emotionally and spiritually.

Simply put, if given the chance, Alan Byerly will do everything in his power not to disappoint the trust of this Court and show that he is someone who can be rehabilitated and again be a productive member of his community.   For all the reasons set forth above, the defense respectfully requests that this Court vary below the advisory guideline range and impose a sentence that is fair and equitable.

Respectfully submitted,

/s/ James J. McHugh, Jr.
JAMES J. MCHUGH, JR.
Assistant Federal Defender
james_mchugh@fd.org

/s/ Hunter S. Labovitz
HUNTER S. LABOVITZ
Assistant Federal Defender
hunter_labovitz@fd.org

Federal Community Defender Office
for the Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
(215) 928-1100

Counsel for Defendant Alan William Byerly

Dated:        October 14, 2022

## <u>CERTIFICATE OF SERVICE</u>

I, James J. McHugh, Jr., Assistant Federal Defender, Federal Community Defender

Office for the Eastern District of Pennsylvania, hereby certify that on October 14, 2022, I filed

*Defendant's Sentencing Memorandum* via the Court's Electronic Filing (ECF) system, which

sent notification to Anita D. Eve, Assistant United States Attorney, Suite 1250, 615 Chestnut

Street, Philadelphia, PA 19106, via her email address (Anita.Eve@usdoj.gov), and to Caroline

Burrell, Assistant United States Attorney, 555 4th Street, NW, Washington, DC 20530, via her

email address (Caroline.Burrell@usdoj.gov).


<u>/s/ James J. McHugh, Jr.</u>
JAMES J. MCHUGH, JR.
Assistant Federal Defender