# Attachment 3

FD-302 (Rev. 5-8-10)

- 1 of 2 -

**FEDERAL BUREAU OF INVESTIGATION**



OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

Date of entry    02/24/2022

On 02/18/2022, DAVID WRIGHT, date of birth ▮▮▮▮, telephone number ▮▮▮▮, email address, ▮▮▮▮, was interviewed via a Microsoft Teams video conference call regarding the Mace brand Compact Stun Gun. Also present for the interview were Washington, D.C. U.S. Attorney's Office AUSAs Jennifer Blackwell, Caroline Burrell, and Sharon Marcus-Kurn, Chief, Sex Offense and Domestic Violence Section. After being advised of the identity of the interviewing Agent and the nature of the interview, WRIGHT provided the following information:

WRIGHT is a private contractor employed by Axon, a law enforcement technology company that owns the Taser brand electrical shock weapon system. WRIGHT is the Chief Master Instructor for Axon. WRIGHT is also employed by Highmark Health, a company that provides police services to Alleghany Health Network facilities. WRIGHT administers Highmark's Use-of-Force Training Program. Additionally, WRIGHT is the owner of Wright's Gym, a fitness and martial arts gym located in Crafton, PA. WRIGHT was a former police officer with the Pittsburgh, Pennsylvania Police Department, where he was in charge of the department's Use of Force Program. WRIGHT has been shocked multiple times with police-issued electrical shock weapons, in his capacity as a Use-of-Force trainer and instructor. He has conducted multiple validation studies on electrical shock weapons during which he used these weapons on himself.

In preparation for this interview, WRIGHT discussed the Mace Brand Compact Stun gun with Axon's Taser engineers. The engineers described the device as a low charge weapon that would not likely incapacitate anyone as the electrical charge could not override the central nervous system. The engineers also called the weapon "junk." This weapon was designed to cause pain. WRIGHT explained that the strength of electrical shock weapons was measured in microcoulombs, which WRIGHT described as a measurement of energy. WRIGHT used the example of the Taser brand Taser-7 model, which emits 62 microcoulombs. Sixty-two microcoulombs is typically sufficient to incapacitate a person without causing permanent damage. Conversely, a device emitting 7.6 microcoulombs will cause pain, but will not likely incapacitate a person. When manufacturers advertise electrical shock

Investigation on  02/18/2022  at  Pittsburgh, Pennsylvania, United States (Phone)

File #  70A-WF-3371307                                                Date drafted  02/18/2022

by  ARSENI GIULIO J

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; and its contents are not to be distributed outside your agency.

FD-302a (Rev. 5-8-10)

70A-WF-3371307

Continuation of FD-302 of (U) Interview of David Wright , On 02/18/2022 , Page 2 of 2

weapons with an "up-to" microcoulomb rating, this generally means the weapon can deliver a shock from 0 to no more than 7.6 microcoulombs. Microcoulombs don't necessarily correlate to the amount of pain a person may feel when touched with an electrical shock weapon.

WRIGHT reviewed the Mace Brand Compact Stun Gun and intended to order one to conduct validation tests on the weapon. WRIGHT opined this specific weapon was designed as both an impact weapon and an electrical shock weapon, in part because of the weapon's beveled edge and the protruding tabs at the top of the weapon. WRIGHT noted that although the weapon may not be as effective if obstructed by clothing, the electrical current could nevertheless cause a shock through clothing. If the Mace Brand Compact Stun Gun were used on certain parts of the body, either as an electrical shock weapon and/or an impact weapon, it could cause severe pain and serious harm and/or incapacitation. For example, if deployed to the neck, face, or groin. Blindness could occur if the weapon were to make contact with eyes. At a minimum, the weapon would serve to distract, and alter a person's movements. Extended contact with the weapon's electrical charge could cause loss of balance.

If WRIGHT were being attacked with an electrical shock weapon in his capacity as a police officer, he would immediately create distance between himself and the attacker, and draw his firearm as he would have no way of knowing the electrical strength of the weapon. His immediate concern would be to avoid being shocked/struck in vulnerable areas, as this could cause incapacitation, and provide access to WRIGHT's weapons.