UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,    .
    .
        Plaintiff,    .  CR No. 21-0527 (RDM)
    .
   v.    .
    .
ALAN WILLIAM BYERLY,    .  Washington, D.C.
    .  Friday, October 21, 2022
        Defendant.    .  11:12 a.m.
. . . . . . . . . . . . . . . .


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE RANDOLPH D. MOSS
UNITED STATES DISTRICT JUDGE


<u>APPEARANCES</u>:

For the Government:        ANITA EVE, AUSA
        U.S. Attorney's Office
        615 Chestnut Street
        Philadelphia, PA 19106
        (215) 861-8577


For Defendant:        JAMES J. MCHUGH, ESQ.
        HUNTER S. LABOVITS, ESQ.
        Federal Community Defender Office
        601 Walnut Street
        Suite 540 West
        Philadelphia, PA 19106
        (215) 928-1100


Court Reporter:        BRYAN A. WAYNE, RPR, CRR
        U.S. Courthouse, Room 4704-A
        333 Constitution Avenue NW
        Washington, DC 20001
        (202) 354-3186


Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

```
 1                        P R O C E E D I N G S

 2            THE DEPUTY CLERK:  Criminal action 21-527,

 3    United States of America versus Alan William Byerly.

 4    Defendant is present and in the courtroom.

 5        Counsel, starting with the government, followed by defense

 6    counsel and then followed by Probation, please approach the

 7    podium and identify yourself for the record.

 8            MS. EVE:  Good morning, Your Honor.  Anita Eve on

 9    behalf of the United States.

10            THE COURT:  Good morning, Ms. Eve.

11            MR. MCHUGH:  Good morning, Your Honor.

12    Jim McHugh on behalf of Mr. Alan Byerly.

13            THE COURT:  Good morning to both of you.

14            MR. MCHUGH:  Good morning.

15            MR. LABOVITZ:  Good morning, Your Honor.

16    Hunter Labovitz, also on behalf of Alan Byerly.

17            THE COURT:  Okay.  Good morning to you.

18            PROBATION OFFICER:  Good morning, Your Honor.

19    Crystal Lustig from the probation office.

20            THE COURT:  Thank you for being here.

21        So we're here this morning for the sentencing of the

22    defendant, Alan William Byerly, who has pleaded guilty to

23    the charge of assaulting, resisting, or impeding a certain

24    officer using a dangerous weapon, in violation of 18 U.S.C.

25    § 111(a)(1), and to striking, beating and wounding within
```

1    the territorial jurisdiction of the United States, in

2    violation of 18 U.S.C. § 113(a)(4).

3        Let me amend that, which is that Mr. Byerly has pled guilty

4    to assaulting, resisting, or impeding certain officers in

5    violation of 18 U.S.C. § 111(a)(1), and to striking, beating,

6    and wounding within the territorial jurisdiction of the

7    United States in violation of 18 U.S.C. § 113(a)(4).

8        I've received and reviewed the presentence report and the

9    sentencing recommendation from the probation office, the

10   sentencing memoranda from the government and Mr. Byerly, along

11   with the exhibits the parties have submitted.

12       Let me ask, start I guess with Mr. McHugh, are there any

13   additional materials that you request that I consider today?

14           MR. MCHUGH:  There are not, Your Honor.

15           THE COURT:  Ms. Eve, anything else?

16           MS. EVE:  No, Your Honor.  I think you did mention a

17   video exhibit --

18           THE COURT:  Well, I mentioned the exhibits, and I

19   included the video in that.

20           MS. EVE:  Thank you, Your Honor.

21           THE COURT:  Yes.  So Mr. Byerly, today's proceeding is

22   going to have to proceed through a number of steps.  I'm sure

23   you're anxious to get to the bottom line.  We need to go

24   through these steps to make sure there's agreement as to the

25   relevant facts, the guidelines and other considerations.  And

1    if there's any disagreement, then I can hear from the parties

2    and decide any disputes.

3        So the first step is for me to determine whether you've

4    reviewed the presentence report and to resolve any objections

5    to that.  Then the second step is to go through the guidelines

6    and again to resolve any disputes there if there are any.

7    Third step is for me to hear from the government's lawyer,

8    from your lawyer, from you, anyone else you would like for me

9    to hear from today.  And the final step is for me to fashion a

10   just and fair sentence in light of the factors that Congress

11   has specified in a statute, which is 18 U.S.C. § 3553(a).

12   As part of that last step, I'll impose the sentence.

13     So let's start with the presentence report.  I received the

14   presentence report and the sentencing recommendation from the

15   probation office on October 13, 2022.  Ms. Eve, does the

16   government have any objections to any of the factual matters set

17   forth in the presentence report?

18             MS. EVE:  We do not, Your Honor.

19             THE COURT:  Mr. McHugh, does defense have any objection

20   to any of the factual material set forth?

21             MR. MCHUGH:  We do not.

22             THE COURT:  All right.  And are you expecting or would

23   you like a factual hearing on anything today, Mr. McHugh?

24             MR. MCHUGH:  No, we do not.

25             THE COURT:  Okay.  I wasn't quite sure.  I know you

1   submitted the expert report.  Is the expert here to testify or

2   not?

3          MR. MCHUGH:  He is not.  We discussed this with the

4   government counsel.  We'll be moving without objection the

5   report into the record today, and based on that report we'll

6   have argument.

7          THE COURT:  Okay.  That's fine.

8     And Mr. Byerly, are you fully satisfied with your lawyer in

9   this case?

10         THE DEFENDANT:  Yes.

11         THE COURT:  Have you had enough time to talk with him

12   about the probation office's presentence report?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Have you had enough time to talk with him

15   about the government's filings in this case?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  So I will go ahead then and accept the

18   facts as stated in the presentence report as my findings of

19   fact for purposes of sentencing today.

20     And turning to the guidelines, the presentence report sets

21   forth the following calculation, which also mirrors the

22   calculation that the parties set forth in the plea agreement.

23     Before turning to the guidelines, as to Count 2,

24   assaulting, resisting or impeding certain officers in

25   violation of 18 U.S.C. § 111(a)(1), the statutory maximum is

eight years.  And as to Count 7, striking, beating, and
wounding within the territorial jurisdiction of the
United States in violation of 18 U.S.C. § 113(a)(4), the
statutory maximum is one year.

The parties agree that under § 2A2.2 of the guidelines, the
base offense level for assaulting, resisting or impeding
certain officers in violation of 18 U.S.C. § 111(a)(1) is 14.
The presentence report also indicates the base offense level
is 14.

The parties also agree that the offense to which Mr. Byerly
has pleaded guilty, or one of the two, that the victim is an
official victim under guidelines § 3A1.2(a)(1), and so for
purposes of that offense there is a two-level enhancement.

The parties also agree that Mr. Byerly used a dangerous
weapon, a stun gun, in connection with the crime, and that
there is a four-level enhancement based on that.

Let me pause there just for a second, because --
Mr. McHugh, you want to come up to the podium?  I know your
position is a nuanced one on this one I think, because I think
your -- the plea agreement agrees that the enhancement applies
and I don't think you disavowed the enhancement applies, but
you've also indicated to me that you think I should vary
downward because the weapon wasn't a dangerous weapon?  I
guess I need to better understand your position.

MR. MCHUGH:  Yes.  Your Honor, actually, Mr. Labovitz

1  was going to handle this portion of the argument concerning

2  the dangerous weapon.

3          THE COURT:  That's fine.

4          MR. MCHUGH:  I can answer that question, but if the

5  Court was going to get into the argument, that was going to be

6  handled --

7          THE COURT:  Well, I don't want to get in at -- I want

8  to get into that later but not quite yet.  Now I'm just trying

9  to figure out for purposes of the guidelines calculation

10  whether there's agreement that the enhancement applies.

11          MR. MCHUGH:  Okay.

12          THE COURT:  With respect to a variance, I'm happy to

13  hear from you.  I just want to make sure there's not a tension

14  which undercuts your position that the enhancement does apply.

15          MR. MCHUGH:  Yes.  Our position is that under the

16  technical reading of the guideline, including the commentary,

17  that the guideline does apply the four-level enhancement.  So

18  for purposes of calculating the correct guidelines score, we

19  are in agreement with the government that the four-level would

20  be handled -- or would be added.  Our position is that we

21  would be arguing for a variance given the reasons we set forth

22  and that will be certainly gone into detail in a few minutes.

23          THE COURT:  So the only thing that's causing me any

24  pause about that is -- I think that argument is fine for

25  purposes of a variance.  But at least at times in your

1    memorandum you seem to go a step further and say that the

2    Court shouldn't rely on the commentary because the commentary

3    is in tension with the plain language of the guideline, and

4    therefore, I should disregard the commentary, which sounds to

5    me more like a guidelines argument than a variance argument.

6         MR. MCHUGH:   It's not.   And if it was overstated, then

7    that's our mistake.   Our argument concerning the commentary is

8    what weight should the Court give, once the four levels is

9    applied, which we agreed to, to a variance, and how strong is

10   this four levels and how strong would our request for a

11   variance be given how this four levels came about that we

12   agree does apply.   So we are not attacking the commentary or

13   the guidelines as far as the four-level enhancement.

14        THE COURT:   Okay.   That's helpful.   And I do think that

15   given the parties' agreement the enhancement applies -- and

16   I've done some independent review of this and I do think the

17   enhancement does apply notwithstanding any argument that the

18   commentary goes further than the plain language of the

19   guideline provision itself with respect to the enhancement.

20   And in particular I think the D.C. Circuit 's decision in

21   *United States v. Davis*, at 635 F.3d 1222, from February 2011,

22   addresses the issue, and makes clear that even within the

23   constraints on commentary, that the commentary does apply and

24   that a dangerous weapon can include an item that, even if it

25   ultimately proved not to itself be dangerous, if it created

1    the impression that the object was an instrument capable of

2    inflicting death or serious bodily injury, that is sufficient.

3        And in reaching the conclusion and relying on that

4    commentary, the D.C. Circuit at footnote 3 says:  We consider

5    the commentary authoritative unless it violates the

6    constitution or a federal statute or is inconsistent with or a

7    plainly erroneous reading of the guidelines.  And the D.C.

8    Circuit concludes in that case that reading the guideline in

9    light of the commentary does not violate that principle.

10       So I do think that the guideline does apply here, the

11   enhancement applies, although we can talk further about

12   whether there's a variance when we get to that.

13       MR. MCHUGH:  And just one point, Judge.  When you were

14   speaking about the official victim, we had it as a six-level

15   enhancement, not a two-level enhancement.

16       THE COURT:  Did I -- if I said two, I misspoke.  Thank

17   you.  I may have misspoken.  So it should be six.  Thank you

18   for that.

19       So with respect to Count 7, the violation of 18 U.S.C.

20   § 113(a)(4), the parties agree that under guidelines § 2A2.3A

21   the base offense level for striking, beating, and wounding

22   within the territorial jurisdiction of the United States in

23   violation of 18 U.S.C. § 113(a)(4) is 7, and that no

24   enhancements apply.

25       The parties also agree that because the difference between

the distinct groups of convictions is 17, the less serious
event should be disregarded for purposes of establishing a
combined offense level.  So the total adjusted offense level
for the two counts is 24.

The government has represented that Mr. Byerly has
demonstrated acceptance of responsibility in a manner that
entitles him to a two-level reduction.  And the government
also represents that Mr. Byerly has assisted authorities in
the investigation or prosecution of the case by timely
notifying authorities of his intention to enter a plea of
guilty, entitling him to a further one-level reduction.  So
that leads to a total offense level of 21.

With respect to Mr. Byerly's criminal history, the
presentence report notes that he does have four prior
convictions but none of them result in criminal history
points, so he's in criminal history category I.  And an
offense level of 21 and a criminal history category of I, the
guidelines range is between 37 and 46 months.

Mr. McHugh, anything to clarify or amend with any of that?

MR. MCHUGH:  No, Your Honor.

THE COURT:  And Ms. Eve?

MS. EVE:  No, Your Honor.

THE COURT:  And turning to applicable penalties, under
18 U.S.C. § 3583(b), for Count 2 the Court may impose a term
of supervised release of up to three years, and the guidelines

recommend a term of supervised release between one and three years.  Under 18 U.S.C. § 3583(b)(3), for Count 7, the Court may impose a term of supervised release of not more than one year, and the guidelines recommend a term of supervised release of one year.

And pursuant to 18 U.S.C. § 3624(e) multiple terms of supervised release shall, at least for purposes of the guidelines, run concurrently.

Under 18 U.S.C. § 3561(c), Mr. Byerly is eligible for one to five years of probation on Count 2, because Count 2 is a Class 3 felony, and up to five years of probation on Count 7 because it's a misdemeanor.  However, under § 5B1.1, because the guidelines range for the offense to which Mr. Byerly has pleaded guilty is in Zone D, he's ineligible, again for purposes of the guidelines, for probation.  And the guidelines are of course just advisory, not binding on the Court.

The maximum fine for Count 2 is $250,000.  And the maximum fine for Count 7 is $100,000.  And with respect to an offense level of 21, the guidelines recommend a fine between $15,000 and $150,000.

The probation office has reviewed Mr. Byerly's financial information and has indicated he does not have the ability to pay a fine in addition to restitution.  The parties have agreed in the plea agreement that Mr. Byerly shall be required to pay $2,000 in restitution to the Architect of the Capitol.

And the government now requests that the court order payment
of $2,000 in restitution.

There's a mandatory special assessment of $100 on Count 2
and $25 on Count 7, for a total of $125.  Anything to add or
amend with any of that, Mr. McHugh?

MR. MCHUGH:  No, Your Honor.

THE COURT:  Ms. Eve?

MS. EVE:  No, Your Honor.

THE COURT:  So I've read both the defendant's and the
government's sentencing memorandum, and I understand that
pursuant to the plea agreement that Mr. Byerly is not seeking
a downward departure.  That doesn't mean he can't seek a
variance, but he's not seeking a downward departure.  And
having reviewed the materials, I do not identify any basis for
a departure in this case.

I want to put on the record the recommendation of the
probation office, which is that Mr. Byerly be sentenced to 41
months of imprisonment on Count 2, 12 months of imprisonment
on Count 7, to run concurrently; 36 months of supervised
release on Count 2 and 12 months of supervised release on
Count 7, to run concurrently; no fine; $2,000 in restitution;
and a special assessment of $125.  And that recommendation is
based purely on the information that is in the presentence
report.

I now need to consider the factors that Congress has

specified in the statute I mentioned a few moments ago, 18
U.S.C. § 3553(a).  And I have to ensure that I impose a
sentence that is sufficient but no greater than necessary to
comply with the purposes of sentencing, and those purposes
include the need for the sentence imposed to reflect the
seriousness of the offense, to promote respect for the law,
and to provide just punishment for the offense.  The sentence
should also afford adequate deterrence to criminal conduct,
protect the public from future crimes of the defendant, and
promote rehabilitation.

In addition to the guidelines and policy statements, I need
to consider the nature and circumstances of the offense, the
history and characteristics of the defendant, the need for the
sentence imposed, the guidelines range, the need to avoid
unwarranted sentencing disparities among defendants with
similar records who have been found guilty of similar conduct,
and the types of sentences available.

Ms. Eve, would the government like to be heard with respect
to the 3553(a) factors?

MS. EVE:  Yes, Your Honor.

THE COURT:  Okay.

MS. EVE:  The Court has noted it is in possession and
has read the government's sentencing memorandum.  In our
memorandum we have identified what we think are the important
factors for the Court to consider with regard to this

1    defendant pursuant to 3553(a).  Beginning with the nature and

2    circumstances of the offense, as the Court is well aware, this

3    defendant was charged with and pled guilty to two assaults.

4    The first being with regard to three police officers who were

5    standing the line on January 6.  The defendant approached them

6    and raised a stun gun and activated that stun gun, placing

7    these officers in fear of being shocked by an electrical

8    device as well as being incapacitated.

9          THE COURT:  Can I ask you a question about the stun

10   gun?

11         MS. EVE:  Yes.

12         THE COURT:  Is this the type of stun gun where you have

13   to actually make contact with somebody?  Or is it the type of

14   stun gun where at a distance you can actually stun somebody?

15         MS. EVE:  My understanding, Your Honor, and I'm going

16   to ask my -- the defense counsel to get into this as well, but

17   my understanding is that you would have to actually have

18   contact with the individual.

19         THE COURT:  And he never -- I mean, he was obviously at

20   other times in close contact with law enforcement.  He wasn't

21   within arm's reach of the law enforcement officers at the time

22   that he discharged this, was he?  My -- from looking at the

23   video, it looked to me like he was behind some other people

24   and held it up in the air when he discharged it, and so it

25   wouldn't have been possible to actually -- I know there's a

1    dispute about whether this device actually even was a stun gun

2    or had the capacity to stun somebody.  But if it has to be in

3    contact, there was a row of people I think between him and the

4    police and he had his arm up in the air, but wasn't within

5    arm's reach, my recollection is from looking at the video.  So

6    he couldn't have touched them.  Isn't that right?

7          MS. EVE:  I think your recollection is correct,

8    Your Honor.  The time that he activates the stun gun, he does

9    have it up in the air and he has -- he's approaching the

10   officers.  And you are correct that there were people in front

11   of him.  And what happened was the police officers then

12   grabbed for the stun gun and dispossessed the defendant of

13   that stun gun, and then the defendant went after the police

14   officer's baton.  So there's the wrestling over the baton.  So

15   he does have physical contact with at least one of the

16   officers.

17         THE COURT:  I see.  So he did have it in has hands

18   still, at least at the time he was disarmed of it.

19         MS. EVE:  Yes.

20         THE COURT:  And he was within arm's reach obviously at

21   the time he was disarmed because the police were right there.

22         MS. EVE:  That's correct.

23         THE COURT:  But not at the moment in time when he

24   actually discharged it.

25         MS. EVE:  Correct.

1            THE COURT:  Okay.  That's helpful.  Thank you.

2       So let me ask you a question about that.  I'm wondering

3    whether that means I should be applying the -- there's a

4    four-level enhancement if someone used a dangerous weapon, and

5    a three-level enhancement if someone brandished it, where its

6    use was threatened.  And I guess the question I have is

7    whether this really, going back to the guidelines, should be a

8    three or a four-level enhancement, whether he in fact used it

9    or only brandished it, if he had to actually be in contact

10   with the officers, and he wasn't in contact with the officers

11   at the time that he actually discharged it.

12            MS. EVE:  Your Honor, I think the difference is, if the

13   defendant had just simply raised it and not activated it, we

14   would be talking about the three levels.  But because he did

15   activate it and then caused the disruption of the police

16   officers, it's our mind -- and this was one of the things that

17   we discussed in terms of negotiating the plea here -- that

18   there was use, and thus the four-level enhancement was

19   applicable.

20            THE COURT:  Okay.  Thank you.

21            MS. EVE:  I forgot where I was, but doesn't matter.

22   I'll just keep going.

23            THE COURT:  Whatever you like, that's fine.

24            MS. EVE:  As I indicated, there was the altercation

25   with the police officers.  But before that, there was the

1    defendant's assault of the AP reporter.  And it was

2    interesting, when Mr. Byerly was arrested, I think one of the

3    first things he said was:  I did one stupid thing.  And what

4    he was talking about was only the assault of the AP reporter.

5    And there was questioning by the FBI agents who arrested him

6    with regard to, did you have any other confrontations?  Did

7    you have any confrontations with law enforcement officers?

8    Were you ever on the ground?  And Mr. Byerly denied

9    repeatedly.

10       It wasn't until about 30 minutes into the interview when

11    the FBI agent circled back that the defendant did admit that

12    he had a confrontation with police officers, and that's when

13    he identified the stun gun, after previously saying that's not

14    my hand, there's nothing in my hand.

15       But -- so in sequence, Your Honor, there's the first thing

16    that there is and the only thing that he initially admitted to

17    was the assault of the AP reporter.

18       The assault of the officers followed, and then there's also

19    an important situation that occurred.  And we only learned of

20    it after the defendant entered his plea, which was the

21    defendant, assisting other rioters in terms of moving the

22    Trump billboard sign and plunging it towards the line of

23    police officers on the lower west terrace.

24          THE COURT:  So I watched the video on that as well, and

25    I certainly see him assisting, although in a fairly anemic way

1    in that he has a hand up there, you know, on it.  He's not the

2    one who's actually personally sort of forcing it at the police

3    officers.  He does have a hand up on it.  If we were carrying

4    a piece of furniture together and he -- I wouldn't think he

5    was giving me a lot of help if he put his hand on it the same

6    way.

7         MS. EVE:  I don't know, Your Honor.  From my

8    understanding, this was a very heavy item.

9         THE COURT:  Yes.  Yes.  It was clearly very dangerous

10   what was going on there; no doubt about that.

11        MS. EVE:  So all hands on deck, and all hands

12   contributed to use of that billboard as a battering ram.

13        THE COURT:  Okay.  I maybe need to take a little more

14   careful look at that video, because my recollection was he was

15   not one of the principal movers.  I'd have to look at it a

16   little more carefully.

17        MS. EVE:  Oh, I'm not suggesting at all that he was one

18   of the principal movers.  I think he just joined in.

19        THE COURT:  Okay.

20        MS. EVE:  So there, Your Honor, are the nature and the

21   circumstances of Mr. Byerly's conduct on January 6, which is

22   the first factor.

23      Fortunately, fortunately, the AP reporter was not seriously

24   injured.  The police officers were not seriously injured as a

25   result of the assault.  But the defendant's actions certainly

scared the police officers and caused them to yell "taser

taser, taser," which is certainly understandable.  And then as

I indicated previously, once the stun gun was taken from the

defendant, then he tried to go after the officer's baton, and

in one of the videos that we presented to the Court, the

defendant and the police officer are wrestling over that

baton.

   And there's one of the videos that the government submitted

to the Court that is almost like -- it's not a ground level

video, it's above.  And so you can see the officers wrestling

with Mr. Byerly, and he's clearly on the ground resisting

what's going on with the officers.

   THE COURT:  Did you agree with the defense that the

stun gun was, quote, junk?

   MS. EVE:  Well, that wasn't their expert; that was

Mr. Wright, who the government hired.

   THE COURT:  Okay.  So do you agree with your own

expert?

   MS. EVE:  Well, you know, I have informed Mr. Labovitz

and Mr. McHugh that we're going to agree with their expert

that this was a low-level energy device.  When I was -- after

reading the expert -- I can't remember his name -- the defense

expert's report, I was reminded of this device that my brother

brought home back in the '60s.  And he put it in his hand and

then he wanted to shake your hand and when you shook the hand,

1    there was that --

2             THE COURT:  Joy buzzer.

3             MS. EVE:  Yes.  That.  Not fun.

4             THE COURT:  No, no, no.  And I don't mean to suggest

5    for a minute that this wasn't terrifying to the police

6    officers who were there.

7             MS. EVE:  Right.

8             THE COURT:  But obviously there's a difference between

9    doing something that is terrifying to the police officers and

10   doing something that could have resulted in serious and grave

11   injury to them.

12            MS. EVE:  Agreed.  Agreed.  And so I'm just saying that

13   when I read the defense's expert report, I was reminded of

14   that little zapper.  It was -- what do you call it?

15            THE COURT:  Joy buzzer?  I have a memory from my

16   childhood as well.  My suspicion is this was probably a little

17   bit more serious than that.

18            MS. EVE:  Oh yes.  But I'm just saying that that little

19   joy buzzer is not going to cause serious bodily injury, and

20   that's not what the defendant had on that day.  And he clearly

21   created the impression in these police officers' minds that

22   the defendant had a taser and they were subject to being

23   shocked and incapacitated.

24            THE COURT:  Yeah.

25            MS. EVE:  The next factor is the defendant's history

and characteristics.  And certainly, the defendant has at
least two old convictions for battery, and also a more recent
conviction for DUI.  He's had four arrests that have not
resulted in convictions, the most recent of which was for
harassment.  But that occurred 10 years ago.  So he does not
have a criminal history that is quantifiable for purposes of
increasing his criminal history points in this matter.  So he
is clearly a criminal history category I.

There is a serious need, as there is in most of these
January 6 cases, Your Honor, for the sentence imposed to
reflect the seriousness of the offense and to promote respect
for the law.  January 6 was an incredible day, not in a
favorable light.  In a very unpleasant light.

The world saw police officers being pummelled, being
assaulted.  People were injured.  And put the perspective of
lawlessness like the movie The Purge.  All of these people
just doing whatever they wanted, disregarding police officers,
having no respect for police officers.  It was pure and simple
chaos.

And the punishment that this court should impose on this
defendant should reflect the three assaults.  His
ridiculously -- disregard for police officers and their job
and the role that they were playing on January 6.  So a lesser
sentence, something like -- I respect the probation officer's
recommendation, but I don't think that they had all the facts,

and I know they didn't have all the facts because they weren't aware of the defendant's assault with the battering ram, or the billboard battering ram.

But under all of the circumstances, Your Honor, the government has recommended at least the top, the very top of the guidelines because that will serve as a clear indication of the offense that this defendant -- offenses the defendant engaged in on January 6.

We also identified in our sentencing memorandum the deterrence that should occur in this case.  General deterrence, of course, as I just indicated, the Court should send a message:  This behavior is not going to be treated lightly.  And as to specific deterrence, just saying, you know, oh, I'm sorry or, you know, I shouldn't have done that, that's not enough.  This defendant needs to feel the consequences of his actions, and that's again why we're asking for the sentence at the top of the guidelines.

Your Honor, as you note on pages 38 through 42, the government has highlighted similar cases, but no case is exactly like this one.  There are some defendants who did more, some who did less, some who did different things.  I could not find a case where an individual engaged in three separate assaults like this defendant did.  But I did try to highlight cases that I did find that I thought were close and that should be considered by the Court.

1  There was one case -- and I apologize, I miscited the

2  judge.  I think that was in the Languerand case.

3  THE COURT:  I think you said it was Judge Boasberg and

4  it was Judge Bates?

5  MS. EVE:  That's correct.  Got the B's confused.

6  But, Your Honor, for all of the reasons we stated in our

7  sentencing memorandum, and the Court's determination already

8  with regard to the significance of the commentary to the

9  applicable guideline for the Section 111(a)(1) conviction, the

10  commentary is so applicable to this case.  It's just so apt.

11  And I don't want to propose an anticipatory response to the

12  defense's argument with regard to variance, so after the

13  defense argues their variance, I would like to respond.

14  THE COURT:  That's fine.

15  MS. EVE:  Thank you, Your Honor.

16  THE COURT:  Okay.  Mr. McHugh?

17  Leave it up to you whether you or Mr. Labovitz goes first.

18  MR. MCHUGH:  Yes.  I was going to go first and then

19  Mr. Labovitz.

20  THE COURT:  That's fine.

21  MR. MCHUGH:  Your Honor, Alan Byerly has accepted

22  responsibility for his actions on January 6, and he has pled

23  guilty before this court to the charges that were brought

24  against him, that were appropriately brought against him.  The

25  other charges in this case were dismissed, either through

1    negotiations or through the government's motion.

2        He stipulated to detention.  He offers no excuses for his

3    actions.  He knows what he did on that day was wrong.  Counsel

4    for the government talked about his statement to the police

5    which occurred within the first hour or two after he was taken

6    into custody.  And again, in our sentencing memorandum we

7    stated to the Court that he absolutely knows he was wrong.  At

8    first misrepresenting his conduct to the police, but in that

9    very same interview, after he was confronted with what he had

10   done, he fully admitted to his participation in January 6.

11       Also, he assisted the police as they're searching his house

12   where to find all the items that would identify him, his

13   clothing, his backpack, things of that nature.

14       As he stands before you today, Your Honor, he's 55 years

15   old.  He's been incarcerated for 15 and a half months.  During

16   that time he has remained misconduct-free.  He hasn't had a

17   conviction in any type of court for 18 years.  He's a skilled

18   carpenter and a family man.  He's always provided for his

19   family.  In 2020 he was employed as a carpenter and because of

20   the pandemic he lost his job.  And that was a serious jolt to

21   his entire life.

22       The Court is in receipt of character letters from his

23   stepmother and his aunt, and it shows what a good father and

24   son and nephew he is.  I would ask if the Court would permit

25   me to have two of the character witnesses that are here today

1    to stand and be recognized by the Court.

2         THE COURT:  That's fine.  And if they wanted to address

3    the Court, that would be fine as well.

4         MR. MCHUGH:  Just to be recognized to identify.

5         THE COURT:  Sure.

6         MR. MCHUGH:  Here today is his aunt, Susie Pultro.

7    Stand?  And her husband, David Pultro.

8         THE COURT:  Thank you both for being here.

9         MR. MCHUGH:  I suggest to the Court you will find when

10   you hear from Mr. Byerly that he can be that type of person

11   again when he is finished serving his sentence.

12       I would like to talk to the Court about the two assaults

13   that occurred.  The government talks about three assaults.  I

14   understand there's been this situation with the sign.  I would

15   agree with the Court that, first of all, there's no allegation

16   that anybody was injured, but Mr. Byerly's participation is

17   essentially almost like a touching of the sign as about 50

18   other people had been moving it forward.

19       The assault on the AP reporter, first of all, Mr. Byerly

20   offers no excuse for touching this individual.  I would note

21   that the Court can see that video probably the best of any of

22   the videos where you can see him grabbing him by the collar

23   and basically forcibly walking him backwards in a improper

24   way.

25         THE COURT:  Do you have any idea why that took place?

1           MR. MCHUGH:  Yes.  There was a scream in the crowd that

2    this gentleman was from antifa.  They were saying he's antifa,

3    get him out of here.  Mr. Byerly heard someone say you gotta

4    leave.  So he participated in forcibly walking him away.

5           THE COURT:  It was a little bit more than that.  In the

6    same way I don't want to overstate what happened with the

7    sign, he was violently moving him.

8           MR. MCHUGH:  Yes.  The video couldn't be clearer.  That

9    is clearly one that really requires no explanation.  What I

10   would point out, in context, there was no kicking, there was

11   no punching, it was a grabbing and pushing.  And also, there

12   was the fact that this reporter was then -- the video shows he

13   was pushed over the wall.  Mr. Byerly had released him by then

14   and it was another individual who had done that.  That

15   individual is actually before Your Honor, Mr. Scott Burlew,

16   and he's charged with that offense for pushing the reporter

17   over the wall.  And he's been on bail since the time he's been

18   charged.

19       So I just put that as far as context.  And there was no

20   representation from the government that this reporter was

21   injured in any way.  But again, as I discuss these, I just

22   want the Court to know that Mr. Byerly is not offering this as

23   an excuse for his improper conduct.

24       Now I'd like to turn to the assault on the police officers.

25   Your Honor is correct, the statement of offense that was

1      agreed to by both parties talks about how the stun gun was

2      held straight up in the air.  And it was activated at that

3      time.  Basically, when you look at the government's timeline,

4      from the time it was held up in the air and activated, it was

5      within a second or two knocked out of his hand by the baton.

6      And then it fell to the ground.

7              THE COURT:  It looked to me like Mr. Byerly was lunging

8      forward with it too.

9              MR. MCHUGH:  With another hand.  This was up, the other

10     hand was moving forward, but the stun gun as far as I can see

11     from the video was held straight up and then knocked out of

12     his hand.

13             THE COURT:  But what I mean is it looked to me, as I

14     mentioned, he was behind a line of people, but that he was

15     lunging through that line towards the police.

16             MR. MCHUGH:  Yes, I think that's a fair representation.

17     I also think it's fair -- I agree with the government that

18     this is a device that cannot -- our position is it can't cause

19     harm, but if it was ever going to be of any effect on an

20     individual it would have to be through contact of that

21     individual --

22             THE COURT:  It would actually have to touch --

23             MR. MCHUGH:  Touch the person.

24             THE COURT:  Touch skin or touch fabric?

25             MR. MCHUGH:  I would say skin.

THE COURT:  I know you will say it, but what is the truth of the matter?  Is there evidence on that one way or the other?

MR. MCHUGH:  I would defer to Mr. Labovitz on that.

THE COURT:  Okay.  Okay.

MR. MCHUGH:  He can answer that question.

THE COURT:  And when you say to cause harm, and maybe I should wait for Mr. Labovitz about this, but I'm curious as to what that means.  It sounds like it still probably wouldn't be very pleasant to be shocked by this even if it couldn't cause muscular dysfunction.

MR. MCHUGH:  I would also note, Your Honor, that after it was knocked out of the hand, I think an important point in the statement of offense is the grabbing of the baton.  And there's no dispute, as you see from the statement of offense that was agreed to by both sides, that he grabbed the baton.  It's as clear as day.

The government argued that it was an attempt to take it from the officer, but that never occurred.  What I can tell the Court is he never possessed the baton.  He never -- that grabbing was after he'd been struck with the baton a number of times where he was struck on the head and on the hand itself.  And Mr. Byerly's view of that was he was grabbing that baton to stop the hitting, never to take it from the officer.  That -- facts speak to that, which is that never happened.

1      THE COURT:  So if the device wouldn't function like a

2   traditional stun gun, what was Mr. Byerly doing?  I mean, did

3   he think it would?  He's lunging through a group of people

4   with something held in his hand that is making a noise like a

5   stun gun, that is advertised and sold as a stun gun, lunging

6   at police with it.  What was the purpose?  What was he doing?

7      MR. MCHUGH:  In his words he was being an antagonistic

8   jerk.  Just at that moment, not thinking clearly and acting in

9   an intimidating way.

10      THE COURT:  So trying to scare.

11      MR. MCHUGH:  Yeah.  Intimidating by turning that on.

12   Yes.

13      THE COURT:  Okay.

14      MR. MCHUGH:  I would also note, Your Honor, when you're

15   looking at that set of facts concerning the police -- because

16   that video, after you see the holding up and then the grabbing

17   of the baton, it becomes kind of a scrum.

18      THE COURT:  It does.  I've had to watch it in slow

19   motion.  It's a little hard to watch.

20      MR. MCHUGH:  There were no injuries to the police

21   officers as the same with the AP reporter.  He never crossed

22   the police line.  He never went into the Capitol, obviously.

23   And after basically he was knocked to the ground, you can see

24   him crawling away.  And that was essentially the end of it at

25   that point for Mr. Byerly and any type of improper conduct

1    with anybody.  He went back to the bus that he came down on.

2          THE COURT:  Right after that or how long after that did

3    he go to the bus?

4          MR. MCHUGH:  I think he started making his way -- he

5    was done.  He had been shook up pretty bad.  He had taken

6    blows to the head, and you can see in the video that shows his

7    hand, it has an immediate goose egg on it from swelling from

8    where the baton hit him.  So he walked back to the bus.

9          THE COURT:  Okay.

10          MR. MCHUGH:  I would close by just discussing a couple

11    of the cases we cited in our brief but didn't discuss, and

12    these are for purposes of unwarranted sentencing disparities.

13    These cases are 111(a) cases, directly on point with the most

14    serious charge that Mr. Byerly pled guilty to, and in these

15    cases it was the most serious charge.  And I know the Court's

16    familiar with these cases.

17          *United States v. Leffingwell*.  Mr. Leffingwell, same exact

18    charge as Mr. Byerly, and he received a six-month sentence.

19    The facts of his case based on review of the government's

20    sentencing memorandums, he was in front of the crowd that

21    entered the Capitol, he in fact entered the Capitol.  He

22    punched two officers in the head and the neck, and essentially

23    was taken into custody at that point.

24          The other --

25          THE COURT:  I know my colleagues well enough, there has

1    to be something else there.  Someone who punches two officers

2    in the head is not going to traditionally get six months.

3    There must be something else going on there.

4         MR. MCHUGH:  Right.  And I think -- we're getting into

5    the situation with these cases where you're starting to

6    compare because you're getting more and more of these cases to

7    compare.  And there comes a point where every case has

8    different mitigation.  And I think what the Court's pointing

9    out here is Mr. Leffingwell's mitigation and what was

10   presented.  To try and track the mitigation and compare the

11   mitigation to Mr. Byerly is difficult, but I think the Court

12   can still look at the facts of the crimes to make an

13   assessment.

14      The next case I would ask the Court to consider is *United*

15   *States v. Creek*.  Again, I know from other sentences that the

16   Court has imposed in proceedings, the Court is familiar with

17   that case.  Mr. Creek received a 27-month sentence, and he was

18   charged with -- his No. 1 offense was 111(a).

19      He brought mace and a knife to January 6.  He pushed

20   through a bike rack barrier.  He breached the police line.

21   And again, these are all facts from the government's

22   sentencing memorandum.  He grabbed an officer, pushed

23   forcefully, hit the officer in the face shield.  He then ran

24   around and attacked another officer, shoved that officer and

25   kicked him to the ground.  Then he threw a ratchet strap at

1    the officer, which they believe had a heavy metal buckle on

2    it.  And that was -- Mr. Creek received 27 months.

3        And the last case -- and these are cases we cited in our

4    brief but I wanted --

5            THE COURT:  I didn't see the cases you just discussed

6    in your brief.

7            MR. MCHUGH:  Yeah, we -- essentially a string cite.

8    The cases we discussed the facts are the cases the government

9    relied upon, in order to distinguish those.  But the cases

10   that we think the Court should consider, we cited.

11           THE COURT:  Well, let's go back to these for a second

12   because I want to look at these in the government's chart.

13   The first one again?

14           MR. MCHUGH:  Leffingwell.

15           THE COURT:  So let me see if I can find that.

16       Okay.  Leffingwell was the first one, the second one was

17   Creek you said?

18           MR. MCHUGH:  Yes.  And Judge, for your reference, on

19   page 27 of our sentencing memorandum is where we listed these

20   three cases.  We chose to distinguish the cases relied upon by

21   the government but did a string cite for the cases we thought

22   the Court should look at, and then obviously address them in

23   more detail at this --

24           THE COURT:  In Creek I see that's Judge Friedrich who

25   gave the sentence the government recommended.  The government

recommended 27 months and she gave 27 months in that case.

MR. MCHUGH:  Yes.

THE COURT:  What's the next one?

MR. MCHUGH:  What you'll find in Creek is that he did not have the four-level enhancement.  Because even though he did all that stuff and even though he threw that ratchet strap at the officers, the government did not require him to plead to the four-level deadly weapon enhancement.

THE COURT:  Okay.

MR. MCHUGH:  And the third case is United States v. Wilder.

THE COURT:  Wilder?

MR. MCHUGH:  Wilder, also the exact charge, 111(a).

THE COURT:  With a W?

MR. MCHUGH:  Yes.  W.  W-I.  Willden.

THE COURT:  Oh, Willden.  Ricky Willden?

MR. MCHUGH:  Yes.  And he received 30 months.

THE COURT:  No.  He actually received I think 24 months and the government requested 30 months.

MR. MCHUGH:  30, right.  And he received 24.  He went to the door of the Capitol.  He sprayed chemical spray at an officer.  He then threw the can of chemical spray at the officer.  He then entered the Capitol for 18 minutes.  And afterwards he posted:  "I think they got the message."

And so I think those -- you know, those are all individuals

1     that were charged with 111(a), exactly as Mr. Byerly, as their
2     lead charge, and those are the sentences they received.
3         Also I think important, and we did hash this out in our
4     memorandum, is the cases of Mault and Mattice.  And those
5     gentlemen, same thing, 111(a).  And they received 44 months.
6     But in their reply brief -- the government filed their
7     sentencing memorandum, the defense filed their sentencing
8     memorandum, and then the government replied.  Because Mault
9     and Mattice relied upon Creek to say, hey, you should look at
10    that case.
11        And the government distinguished Creek with Mault and
12    Mattice by saying, hey, they didn't have deadly weapons, Mault
13    and Mattice did.  And that's why I think this variance
14    argument we're making to Your Honor is very critical.  Because
15    you have individuals -- and their lawyers did not in any way
16    dispute that they had deadly weapons and that those deadly
17    weapons could actually cause death or danger.  That was not
18    even an issue at the sentencing.  Not to mention their actions
19    were way more extreme than Mr. Byerly's.
20        But the government made that very distinction about the
21    possession of a deadly weapon.  And that's why I think that
22    the variance argument that we're making, when you look at
23    these sentences at this end of the spectrum, and then others
24    like Mault and Mattice at the higher end of the spectrum, the
25    government makes that point, that the weapon itself, the

1    degree of danger that it can cause --

2         THE COURT:  What was the weapon in Mault and Mattice?

3         MR. MCHUGH:  Mault and Mattice had bike rack and

4    chemical spray.

5         THE COURT:  Bike rack presumably was the bike racks

6    that were there.

7         MR. MCHUGH:  Yeah.

8         THE COURT:  And chemical spray?

9         MR. MCHUGH:  And chemical spray.  These individuals,

10   like I said, they did more than --

11        THE COURT:  Those don't strike me as inherently more

12   dangerous than --

13        MR. MCHUGH:  They climbed over bodies.  They were in

14   the west tunnel.  They were right up there spraying it.  Not

15   just the weapon; their actions were more egregious than

16   Mr. Byerly.  But the government made this point that we're

17   making, which is the Court should look carefully at the actual

18   item that they had.

19        THE COURT:  Well, let me ask you, what was Mr. Byerly's

20   intent?  In your sentencing memorandum you say that the item

21   had gone off accidentally.  I mean, he did go and buy

22   something that was called a stun gun.

23        MR. MCHUGH:  Yes.

24        THE COURT:  He describes it to somebody else in the

25   crowd as a stun gun.

1          MR. MCHUGH:  Yes.

2          THE COURT:  What evidence do I have in front of me with

3     respect to what he thought was going to happen if he actually

4     contacted a police officer with that item?

5          MR. MCHUGH:  He accidentally -- you're talking about

6     how he accidentally -- or stun gunned himself?

7          THE COURT:  Yes.

8          MR. MCHUGH:  Yes.  He did that in the week or two

9     before he went down to Washington.

10          THE COURT:  And what happened?

11          MR. MCHUGH:  It felt like a minor jolt.  He talks about

12     that in his videotape statement to the FBI.  He said he did

13     this and he said I barely felt anything.  He could tell it was

14     not dangerous.

15        And the officer described it, yeah, it looks like you had a

16     flashlight.  And that's in the videotape.

17          THE COURT:  Okay.

18          MR. MCHUGH:  At this point, Your Honor, if I could turn

19     it over to Mr. Labovitz?

20          THE COURT:  That's fine.

21          MR. MCHUGH:  Thank you.

22          MR. LABOVITZ:  Your Honor, Mr. Byerly is seeking a

23     variance under (a)(1) for the nature and circumstances of the

24     offense precisely because the stunner that he had on January 6

25     could not cause any harm and is therefore not a deadly or

1    dangerous weapon.

2        And I just want to say at the outset that in case there's

3    any --

4        THE COURT:  You don't disagree with the proposition

5    that under the guidelines even if it was not itself a

6    dangerous weapon in the sense that it actually could cause

7    death or serious bodily injury, that it closely resembled such

8    an instrument and created the impression that it was such an

9    object?

10        MR. LABOVITZ:  Your Honor, I think everything hinges on

11    that comment E(ii)(II), that it could cause the impression of

12    being dangerous.  E(i) doesn't apply because it doesn't cause

13    any injury, and E(ii)(I) doesn't apply because it doesn't

14    appear to be -- I'm sorry.  The first part of that E(ii)

15    doesn't apply.  It's that second part that talks about whether

16    the object, despite not being capable of causing injury

17    creates an impression --

18        THE COURT:  Don't say -- say not capable of causing

19    death or serious bodily injury.

20        MR. LABOVITZ:  Correct, Your Honor.

21        THE COURT:  I mean, it's clearly capable of causing

22    some type of injury.

23        MR. LABOVITZ:  Yes, but it does not rise to the

24    level --

25        THE COURT:  You could whack somebody in the head with

1    it.  It's capable of causing some type of injury.  I'm just

2    clarifying that.

3          MR. LABOVITZ:  Yes, Your Honor.

4          THE COURT:  But I do agree with you that the question

5    is under -- that it either closely resembles such an

6    instrument or the defendant used the object in a manner that

7    created the impression that the object was such an instrument.

8          MR. LABOVITZ:  And I think if the Court looked at

9    Attachment 1 to our memorandum, it looks like a flashlight.

10   In fact, one end is a flashlight.  It does have electrical

11   prongs on the other end.  That's why I'm suggesting it's

12   really only that Roman numeral II about the impression that

13   the Court should be focusing on, not something that resembles

14   a dangerous object.

15         THE COURT:  I guess it's a little hard for me to know

16   what closely resembles because I don't know what other stun

17   guns look like.  I mean, I've seen some obviously in videos

18   before, but I guess I'm not sure I would look at that and

19   think it's just a flashlight and therefore it's not -- that it

20   doesn't closely resemble.  But granted -- tell me what you

21   think about the second clause, created the impression.

22         MR. LABOVITZ:  Your Honor, there's no doubt that the

23   device creates the impression of being dangerous.  That is

24   what it is designed for.  That's what our expert, Dr. Kroll,

25   the electrical engineer, says.  He says that it creates a loud

1    auditory noise designed to essentially deter anybody from

2    attacking you, but that when it actually touches your skin, it

3    is far below any standards for safety that are accepted by

4    electrical institutions, electrical international standards.

5    Dr. Kroll's report at page 12 says that you could turn this on

6    and touch around the eye and not cause any damage.  He says

7    that you could touch your skin, you would not feel any muscle

8    effects.  He --

9         THE COURT:  What would you feel, though?  Would you

10   feel pain?

11        MR. LABOVITZ:  Dr. Kroll --

12        THE COURT:  In getting ready for today, did you take it

13   out and put it against your arm just to see what happened?

14        MR. LABOVITZ:  I've only heard it, Your Honor.

15   Dr. Kroll turned it on for me and played it over the phone.

16   It sounded like a taser, I admit that.  But, no.  Dr. Kroll

17   was very willing to touch himself with it, but --

18        THE COURT:  Did he do that?  Did he actually use it on

19   himself to see what happened?

20        MR. LABOVITZ:  Yes, Your Honor.  He has used

21   multiple -- that's part of his -- apparently he's told me

22   during his presentations in court he has touched himself with

23   a variety of electrical weapons to show that they are safe.

24   And he touched himself with this weapon and --

25        THE COURT:  So he discharged it on his own skin?

1          MR. LABOVITZ:  Yes, Your Honor.

2          THE COURT:  So what happened?

3          MR. LABOVITZ:  It's interesting -- we did not put this

4     in his report.  He refers to it as a sparkler flashlight to

5     talk about the noise it creates.  But he also, as Ms. Eve

6     mentions, he said it is very much like those joy buzzers that

7     you would put in your hand as a gag when you would shake hands

8     with somebody.

9          THE COURT:  For example, there are collars people

10    sometimes use for training dogs that will -- they're not going

11    to harm the dog but it creates a very unpleasant shock.  Is it

12    like that, do you know?

13         MR. LABOVITZ:  I don't believe so, Your Honor.  My

14    understanding is just you would feel something on your skin

15    like a little tingle.  You know, he compares it to actual stun

16    guns, the kind of voltage and shock they can deliver, and

17    found it was only 2 percent of the current.

18       I think joy buzzer is really an appropriate image to put in

19    the Court's mind as to what this could do if it touches you.

20    You would feel it, but it's not going to incapacitate you in

21    any way.  I think it's going to be an incredibly fleeting

22    sensation.  And so it certainly does not rise to the level of

23    a deadly or dangerous weapon under the guideline.

24       And I think because of that, Your Honor, I think that

25    Mr. Byerly -- a variance is warranted because otherwise he's

1       going to be sentenced like other people who actually had

2       dangerous weapons, including defendants the Court is familiar

3       with, like Matthew Miller.  There's also the case that we cite

4       in our memorandum of Nicholas Languerand who got a 44-month

5       sentence for assaulting an officer with a shield that they

6       took from the officers in the lower west terrace tunnel.

7       Devlyn Thompson received a 46-month sentence for assaulting an

8       officer with a baton.

9           And as the Court is well aware, Mr. Miller as well as

10      Mr. Languerand and Mr. Thompson were all in the lower west

11      terrace tunnel.  There's no evidence that Mr. Byerly entered

12      that tunnel.  And the Court is certainly well aware of how

13      dangerous and violent the conduct in the tunnel was compared

14      to other locations.

15          THE COURT:  Well, this is a pretty violent series of

16      events that took place there.  But let me ask you the same

17      question I guess I put to Mr. McHugh.  I'm still puzzling a

18      little bit about what Mr. Byerly was doing, because -- assume

19      not a stun gun but assume it is a replica of a handgun.  And

20      someone's got a whole bunch of police officers in front of

21      them and they hold the gun up and they come charging at them

22      with a gun.  Maybe they're trying to scare them, maybe they're

23      trying to get themselves shot in the process.

24          I think, quite frankly, if you pull up something like a

25      stun gun and come charging at the police, you're running the

1    risk they're going to shoot you.  I don't know whether that's

2    excessive force or not, but certainly that's a risk if you're

3    charging at the police with a stun gun.

4        So what was going on, to be using something that looked

5    like and sounds like a stun gun?  Obviously it caused harm in

6    that it scared the police officers in the process and

7    prevented them from directing their attention to other efforts

8    to control the crowd.  But what was going on?  I'm still

9    trying to get my head around this.

10           MR. LABOVITZ:  Your Honor -- and of course you'll hear

11   from Mr. Byerly.  I don't have any additional information

12   other than what Mr. McHugh is suggesting, that Mr. Byerly was

13   just being antagonistic and not thinking things through very

14   carefully.  And I think the Court should account for the fact

15   that, as Mr. Byerly told the FBI agents at his interrogation,

16   that he had accidentally shocked himself and he knew it was

17   harmless.

18       But why he decided at that moment to raise up the stun gun

19   and turn it on, I'm sure that's something that he regrets

20   quite considerably.  As the Court noted with Ms. Eve, that's

21   already cost him one level because there's brandishing versus

22   use, and we don't dispute that turning it on was use.

23       And so I guess from our position , Your Honor -- our

24   perspective is that because it wasn't in fact dangerous, to

25   give Mr. Byerly the sentence that the government recommends

1    puts him in the exact same position as at least three other

2    January 6 defendants who did in fact assault law enforcement

3    officers with an actual dangerous weapon.  And while there was

4    certainly fear from -- once he turned it on, he placed those

5    officers in fear, but so did the three defendants we

6    discussed.  When they actually used weapons against officers

7    guarding the Capitol, that certainly created fear too.  So I

8    don't think the fear issue should be dispositive, Your Honor,

9    I think it's the fact that this was not indeed a dangerous

10   weapon.

11          THE COURT:  Okay.

12          MR. LABOVITZ:  And, Your Honor, just in terms of the

13   commentary, if I could just sort of -- I think it would help

14   educate the Court a little bit about negotiations the parties

15   engaged in.  We presented the government with the report from

16   Dr. Kroll, we argued against application of the four-level

17   enhancement for a dangerous weapon, and we were told that was

18   not going to be taken off of the table, but that the

19   government specifically suggested -- that was Ms. Burrell --

20   that the defense could argue for up to a four-level variance

21   based on whether this was a dangerous weapon or not.

22      And based upon that, based upon the case law -- the Court

23   cited the *Davis* case today, I would also note the *Winstead*

24   case from the D.C. Circuit, 890 F.3d 1082, that we discuss in

25   our brief from 2018.  That is not about dangerous weapon, it's

1    about career offender and whether inchoate crimes can apply to

2    the career offender guidelines.  But the *Winstead* case calls

3    into question the applications of the guidelines when it's

4    inconsistent with the plain language -- I'm sorry, the

5    application of the commentary when it's inconsistent with the

6    plain language of the guideline.  So there was in our view --

7         THE COURT:  But if you can clarify what your position

8    is on that, because that's what my question was before.

9    Because that begins to sound like you're disavowing the plea

10    agreement.

11         MR. LABOVITZ:  No, Your Honor.  Because the commentary

12    is given force by case law, there was -- we had to accept that

13    the commentary interprets the guidelines and is part of the

14    Court's discretion in its sentencing.  We're simply saying as

15    a matter of fairness that the guideline's plain meaning of

16    "dangerous weapon" which has been approved by Congress, versus

17    the commentary, which is just the -- I'm sorry, the language

18    that the Sentencing Commission itself adopts, that that should

19    not be given full weight, because the only way that Mr. Byerly

20    gets to dangerous weapon is through that impression language

21    of the application notes.

22         THE COURT:  So your point is just that I should give it

23    less weight.  I can consider it but give it less weight.

24         MR. LABOVITZ:  Yes, Your Honor.  It's simply as a

25    matter of equity that a variance despite the commentary is

1    still appropriate here, to account for the fact that courts,

2    as we cite in our brief, courts most recently, in light of the

3    *Kisor* case in the Supreme Court talking about *Auer* deference

4    and things like that, have started to reevaluate the impact of

5    the commentary when it's confronted with a plain, unambiguous

6    guideline.

7        And so essentially we have to accept that the commentary

8    can be applied, we just -- our position is it's not binding

9    and it doesn't tie Mr. Byerly into being limited to base

10   offense level 21.  It would still permit a variance when

11   everything is considered.

12       And so I think our primary position, Your Honor, is that

13   under 3553(a)(1) this is not a dangerous weapon.  We cited

14   Black's Law Dictionary as well as a Webster's dictionary that

15   I think makes it very clear that what Mr. Byerly had was not a

16   dangerous weapon.  And we also believe that a fair and just

17   sentence in this case should be grounded more in the plain

18   language of the guideline than in the expansive language of

19   the commentary.

20       THE COURT:  Even though you don't dispute the

21   proposition that the commentary is a permissible consideration

22   for the Court.

23       MR. LABOVITZ:  Correct, Your Honor.  Certainly.  And we

24   put some cases in our memorandum from the Third Circuit, from

25   the Sixth Circuit, just to note that there's been a trend

1   since the *Kisor* decision in 2019 sort of moving away from a

2   absolute reliance on the commentary to essentially expand the

3   meaning of the guidelines, but to look more carefully when

4   there is a tension between the commentary and the guidelines

5   and give more weight to the clear language of the guideline

6   than the commentary.

7        But that -- I think -- I could not find a case other

8   than -- *Winstead* again does not speak to dangerous weapon.

9   *Winstead* is speaking to the career offender cases.

10           THE COURT:  But *United States v. Davis* does speak

11   pretty directly to this question.

12           MR. LABOVITZ:  That is correct, Your Honor.  However,

13   that case is from 2011.  I think *Winstead* is again not a

14   hundred percent on point but post *Davis* at least is starting

15   to call the commentary into question.  At least from my review

16   of *Davis*, Your Honor, this issue of whether -- of how much

17   weight a court should give to the commentary when it's

18   inconsistent with the guideline was not at issue.  *Davis* was

19   addressing whether someone's hand would be brandishing a

20   weapon during a bank robbery.

21        Also, Your Honor, we note the *Tate* case from the Sixth

22   Circuit --

23           THE COURT:  I would think someone's hand inside a bag

24   or a jacket is, if anything, less of a concern than something

25   that certainly appears to be a weapon that someone actually

1    brandishes or uses.

2           MR. LABOVITZ:  Well, Your Honor, everything -- I've

3    looked quite long at a lot of these bank robbery cases where

4    people are presenting the finger in the pocket or a toy gun.

5    And they all flow back to this pre-guidelines case from the

6    Supreme Court, the *McLaughlin* case, and that talks about -- a

7    lot of those talk about a gun, whether it's an unloaded gun or

8    a toy gun, still really looks like a gun.  I think

9    Mr. Byerly's device looked like a flashlight if the Court

10   looks at Exhibit 1.

11       And I think that -- and I would also note the *Tate* case

12   that we cited from the Sixth Circuit specifically says this is

13   because of the unique nature of bank robberies, the fear that

14   a fake weapon will instill in the tellers, the guards, the

15   people in the bank, and we reserve any judgment on whether

16   dangerous weapons in other settings can be things that simply

17   give the impression of danger.

18       So I know *Davis* doesn't address that but I think *Tate* very

19   recently at least got into that issue.  So that's why -- I

20   think *Davis* should be cabined a little bit, Your Honor.

21          THE COURT:  And as *McLaughlin* observes, one of the

22   risks with someone using something that looks like or appears

23   to be a functioning weapon is that even if that weapon itself

24   cannot inflict injury, that it's nonetheless going to

25   instigate a response of deadly force that could --

1    MR. LABOVITZ:  Yes.

2    THE COURT:  -- as I said before, it wouldn't be

3    shocking -- and again, I don't know what the rules are with

4    respect to engagement and excessive force, but if somebody's

5    coming at a police officer with something that looks to be

6    like a taser, it would not be shocking if the police officer

7    in the heat of the moment responded by pulling a gun and

8    shooting, in which case maybe the bullet hits Mr. Byerly, or

9    maybe it hits someone standing next to Mr. Byerly.  So it's

10   certainly dangerous in that respect.

11   MR. LABOVITZ:  Yes, Your Honor.  And *McLaughlin*, as the

12   Court mentioned earlier, a non-dangerous weapon can be used as

13   a bludgeon.  *McLaughlin* talks about that as well.  I think

14   that -- I guess at least with respect to Mr. Byerly, because

15   the three defendants that we've cited, Miller, Languerand and

16   Thompson, received sentences of I believe 33, 44, and 46

17   months respectively, to give Mr. Byerly the 46-month sentence

18   that the government is asking for when he wasn't in the lower

19   west terrace tunnel and he wasn't in fact using what is a

20   dangerous weapon, unlike these other individuals, that is

21   essentially the crux of our equity argument.

22   And so, yes, I think he could have been shot.  Other people

23   could have been shot.  But that fortunately did not happen.

24   And so when we sort of hone in on this equity issue, it's our

25   position that a variance is justified here.

1          THE COURT:  Okay.

2          MR. LABOVITZ:  Thank you, Your Honor.

3          THE COURT:  I don't disagree with the proposition that

4     this was less dangerous than it would have been the case if

5     this was a functioning stun gun that actually could have

6     immobilized a police officer.  I understand that point.

7          MR. LABOVITZ:  And, Your Honor, just to be clear, I

8     think it is clear, but it's -- so one end is a flashlight, the

9     other end has two little metal prongs.  Unlike an actual taser

10    which can either be used in a stun gun mode to touch skin or

11    can shoot electric darts, this device could not -- I think as

12    the Court asked Ms. Eve, this device could not project

13    anything.  It would have to have made contact with an

14    officer's skin to essentially give them a little buzz.

15         THE COURT:  Okay.  All right.  Thank you.

16      Mr. McHugh, anything else from you, or does Mr. Byerly want

17    to address the Court?

18         MR. MCHUGH:  No.  I know Ms. Eve wanted to respond.

19         THE COURT:  Why don't I hear from Mr. Byerly first and

20    then I'll give her a chance.

21         THE DEFENDANT:  Thank you, Your Honor.  I'm going to

22    read the remarks because I have never spoken in public before.

23    And knowing that I'm going to be nervous, I don't want to

24    forget anything.

25         THE COURT:  That's fine.  However you want to proceed.

1          THE DEFENDANT:  I'd like to start off by saying I

2     regret my actions and accept the fact that my actions have

3     consequences.  I apologize to the AP reporter and the police

4     officers that were harmed by my actions, for which there was

5     no excuse.

6        I now would like to briefly tell you a little bit about

7     myself over the last few years.  I'm a 55 year-old carpenter.

8     I have an adult son and three adult stepchildren and three

9     step-grandchildren.  Although I'm divorced, I have an amicable

10    relationship with them and also my ex-wife.  In 2018 and 2019

11    I was volunteering at two animal rescue nonprofit

12    organizations.  When I wasn't out of town I was a regular at

13    my local Bible church.  I like to think I am a regular

14    productive citizen, or I was.

15       Life seemed to be going pretty good, but 2020 changed that.

16    The virus hit and I was sent home from work and told to stay

17    at home.  I live alone but I do like to socialize, get out,

18    see bands, sporting events, et cetera.  The impact that the

19    virus had on my day-to-day life gave me feelings of

20    depression, frustration and isolation.  This was early May and

21    then I ended up losing my job because of the COVID shutdowns.

22    The loss of my job made me feel angry and ashamed.

23       I found out about the January 6 event by email from an

24    acquaintance.  There was a bus trip being put together on the

25    6th.  I thought this would be the last chance to see Trump

speak so I decided to go.  Because of the violence and the
protests during the 2020 -- summers of 2020 that I watched on
TV, I decided I should have some sort of protection or a
deterrent, actually, because, you know, I wanted to avoid any
kind of confrontation is most important.  So I went to
Cabela's and found a flashlight stun gun in the camping
section that was about $25.

I didn't go to D.C. to harm anyone.  And also, if I knew
how safe I was going to be in the city, mainly I would say
it's because, you know, living in the country-ish area, we go
to the city, we feel like we should be, you know, have some
kind of protection.  But if I would have felt as safe as I
was, I wouldn't have brought anything, if I'd have known that.
And I'm sorry that I even brought it.

By the time I got to D.C., I could only get as close as
Constitution Avenue.  I could not see or hear anything.  I
decided to leave early and see what was going on at the
Capitol, maybe get a better view of speakers and such.  I
support protesting but I never thought it was something for me
so this was my first time.

Before long I was on the lower west side next to the media
tower where I stayed the whole time.  It was very loud, and
the emotions were at a very high level.  Regretfully, I let my
emotions get the best of me, and I'm very disappointed in
myself for the bad choices I made.  But I know I am 55 years

1    old and I bear sole responsibility for my actions.

2         I would like to talk about the assault on the AP reporter.

3    At one point I heard a voice from the crowd say "That's

4    antifa, get him out of here."  At that time a guy or two

5    pulled the so-called antifa guy to the bottom of the steps.

6         A group of guys were confronting him while I watched.  I

7    assumed they were telling him to leave.  But then he started

8    to go back up the steps, I reached and grabbed him and spun

9    him around and grabbed him by his collar and pushed and pulled

10   him away from the steps.  As I was doing that, I heard another

11   voice from the crowd say, "Hey, he said he was leaving," so I

12   let him go.

13        Then a couple other guys took him over to the wall.  And I

14   didn't see what happened until I got my discovery.  I didn't

15   see what happened after that.  What I didn't see from my

16   vantage point is someone pushed him over the wall to the lawn

17   below.  And I know now he was a member of the press because

18   that's when I saw his lanyard.  I'm thankful to find out later

19   that he was not injured.

20        But make no mistake, this is no excuse for me to put my

21   hands on anyone for any reason.  I should have never gotten

22   involved, and I'm deeply sorry for my actions.

23        I would now like to tell the Court about the assault on the

24   police officers.  I've had over 15 months to think about it,

25   what I did, and honestly, I don't know why, but I have watched

the videos and I know it was absolutely wrong and I have no
excuse for what I did.  I was being an antagonistic jerk, and
I still don't understand how I could do something like that,
because every interaction I've had with police has been
respectful until that day.

I also know that activating the device caused these
officers to be afraid.  Then as I was falling down the steps,
I pulled an officer down with me.  There is no excuse for that
either.  I'm glad that the officer was not injured in any
significant way as I understand.  If they're here today, I
would like to offer my apology for my actions.

Okay.  I do want to respond to one thing the prosecutor
said.  I did not try to take the officer's baton.  I grabbed
it only to stop from being hit, as I'd been hit on the head
and hand already.  I did not try to take it -- intend to take
it, and in fact I did not.

I felt remorse very shortly after I left the chaotic
environment of the crowd.  And that was on the bus, you know,
the decompression time.  So I couldn't understand and I still
don't how I could let myself lose control.  I'm a 100 percent
"back the police" type of person, and I felt so bad I wouldn't
tell even the closest people in my life any details about
January 6.

I know my actions had and have consequences and I'm here to
accept those consequences for my actions.

1    Since my arrest I've lost my place to live that I rented

2    and had to have my belongings put in storage.  I have lost a

3    close family friend who passed away while I was incarcerated

4    and I would not want to experience that from inside a prison

5    again.

6    Because of the high profile of the January 6 defendants, we

7    have been held in administrative segregation, which is

8    solitary confinement.  Of the 15 and a half months, I've spent

9    90 days locked in my cell between 21 and 23 hours a day, and

10   the remainder locked in my cell 18 to 19 hours a day, which is

11   still going on.

12   What I've learned while locked up these last 15 months, I

13   have learned that having disagreements about politics should

14   never, ever result in rioting or violence.  Violence on behalf

15   of political views is not the American way.  I have learned

16   that I need to manage my emotions and anger better.  I need to

17   not let the emotions of the moment cloud my reasoning.  I need

18   to think before I act and consider the effects my actions

19   would have on me and others.  I need to be more open to

20   friends and my family about the things that may be bothering

21   me.

22   What will I do when I get out of jail?  When I get out of

23   jail I look forward to getting back to the simple normal life

24   that I found to be satisfying.  Getting a job will be on top

25   of the list.  I will review some self-help books that have

1   been helpful to me over the last couple of decades and look

2   into ones I have not read yet.  I will keep on working to be a

3   better version of myself, to become a better family member and

4   a friend.

5       I have thought of myself as a work in progress where I can

6   always find room for improvement.  That's my, you know, for

7   the last several decades that's the way I thought of myself,

8   which is part of the disappointment in myself, that I fell

9   back, you know, like that.  This has been a big setback but I

10  am confident I will be able to get back on track with some

11  effort.

12      I would like to end how I started.  I apologize to the AP

13  reporter and the police officers.  I also apologize to Ms. Eve

14  and Ms. Burrell and my family and this court.  Thank you for

15  listening, Your Honor.

16          THE COURT:  All right.  Thank you.  I appreciate those

17  comments.

18      Anything else, Mr. McHugh?

19          MR. MCHUGH:  No, Your Honor.

20          THE COURT:  All right.  Ms. Eve, you want to respond?

21          MS. EVE:  Yes, Your Honor.

22      Your Honor, I have the 302 that was prepared as a result of

23  the interview of Officer Antonio Gould.  "Antonio Gould stated

24  that during the physical altercation, Byerly attempted to use

25  a taser device against officers.  Officer Gould advised he

1   heard the sound of the taser charge.  Officer Ross was first
2   to visually identify and verbally announce the taser.  Further
3   into the struggle with Officer Gould the taser was knocked
4   away from Byerly who then attempted to take Officer Gould's
5   baton away from him.  At this point, as a result of pushing
6   Byerly away from himself, Officer Gould tripped forward,
7   falling to the stairs, catching himself on his hands.  Officer
8   Gould advised that despite being knocked down, Byerly
9   continued to resist being restrained."

10      The attempt to resist being restrained was in one of the
11   videos that was presented to the Court.

12      I bring this to the Court's attention for the mere fact
13   that Mr. Byerly indicated he did not attempt to take Officer
14   Gould's baton away from him and Officer Gould has stated to
15   the contrary.

16      I also want to bring to the Court's attention a couple
17   things that were brought up by Mr. Labovitz.  First of all,
18   Mr. Byerly received a benefit when he pled guilty because the
19   government agreed for him to plead guilty to 18 United States
20   Code § 111(a) as opposed to (b).  And the defendant, as we
21   indicated, agreed to the dangerous weapon enhancement,
22   although their argument seems to go back and forth whether
23   they agree with it or they don't agree with it.  But they did
24   agree with it at the time of the plea.

25      Mr. Labovitz also indicated that there seemed to be a trend

1    in terms of getting away from the commentary.  And I happen to

2    have done some research with regard to commentary, and I came

3    across a case that was decided just 10 days ago.  *United*

4    *States v. Jenkins*.  It's case No. 21-3089.  It's located at

5    2022 Westlaw 6590453.  And as I indicated, it was decided 10

6    days ago on October 11 by the D.C. Circuit.

7            THE COURT:  That's what I was going to ask you, what

8    court.

9            MS. EVE:  In that case the Court relied on the

10   commentary.  And specifically the Court adopted the Sentencing

11   Commission's commentary on a guideline.  Now, this was a

12   situation involving a motion for compassionate release, so

13   it's not one of the January 6 cases.

14           THE COURT:  I know that case, yes.

15           MS. EVE:  Pardon?

16           THE COURT:  I'm aware of that case.

17           MS. EVE:  Okay.  But to suggest that the courts are

18   getting away from the commentary is just simply not the case.

19       I understand from Mr. Byerly's allocution to the Court,

20   explained why he bought the stun gun, why he brought it to

21   Washington, D.C.  But the government is just not clear.  Other

22   than Mr. Byerly saying he was an antagonistic jerk, the

23   thought process that he employed on January 6 is not really

24   before the Court.  What was it, in terms of his thinking?  He

25   hasn't shown that to the Court.  His thinking that made him

1    engage in an unprovoked attack on the police officers with

2    this stun gun.

3         I didn't want to get into this earlier.  I kind of likened

4    the stun gun to that zapper thing, but I did buy a similar

5    device to this flashlight stun gun and I kind of used it on

6    myself.  And the only thing I can liken it to -- and I don't

7    know whether the Court has ever done it, I know when I was a

8    kid -- well, no, still do it now -- test 9-volt batteries by

9    touching them to my tongue.  It's a slight electrical shock

10   that you get.  And I think that that's, in terms of

11   electricity, that's the closest thing that I could share with

12   the Court.

13        So in closing, Your Honor, I simply wanted to say and

14   reiterate that the fact that the commentary to the guidelines

15   is so appropriate in this case in terms of justifying the

16   dangerous weapon enhancement, because clearly these officers

17   were given the impression that this was a taser.  Clearly,

18   these officers were given the impression that this was a

19   device that was going to do harm to them.  Not, you know, kill

20   them, but certainly incapacitate them and make their

21   experience unpleasant.

22        For all of these reasons that I've stated today, as well as

23   the arguments made in the government's sentencing memoranda, I

24   suggest to the Court and I recommend to the Court that

25   sentence that we have recommended at the top of the

1    guidelines.  Thank you.

2         THE COURT:  All right.  Thank you.  Mr. McHugh, any

3    find words?

4         MR. MCHUGH:  Yes, Your Honor.  Just briefly.

5      Your Honor, to the point of the grabbing of the baton,

6    whether it was done in protection or whether it was done to

7    take possession of, the statement of offense that was agreed

8    to by both parties specifically said he grabbed the baton and

9    it stopped there.  It didn't say the officer's version and it

10   didn't say Mr. Byerly's version.  Because when you look at

11   that video, that's all that happened, was the grabbing of the

12   baton.  There was no taking of it.  So that's where the

13   statement of offense stops.

14     The issue of Ms. Eve saying we got a benefit during these

15   negotiations because the government withdrew 111(b) I would

16   like to address.  The complaint and warrant and three

17   indictments, first indictment, superseding and then the second

18   indictment all called the item a taser.  That's what it was

19   identified by the government.  Then Dr. Kroll's report was

20   provided to the government, and it was thereafter that the

21   government changed the term from "taser" to "stun gun" based

22   on the packaging.

23     So to say that we got a benefit because the government

24   finally realized and agrees with Dr. Kroll's report that they

25   were wrong in calling it a taser, I disagree with.

1    I would also suggest to the Court that when the government
2    dropped the 11(b) charge, it did so properly because the
3    statutory definition under 11(b) requires an actual dangerous
4    weapon.

5    Now when you look at the commentary, it expands it.  And
6    that's why we agreed to the four-level enhancement.  But in
7    those negotiations, over the brandishing as the Court brought
8    up, over the four levels that the Court brought up, those were
9    positions that we took that were -- that since the government
10   got into this negotiation issue, that we opposed.  It was the
11   government's suggestion that they were not going to move off
12   of that, but that we could argue a variance as to the four
13   levels of the -- specifically as to the deadly weapon
14   enhancement.

15   And that's how it was left and that's what we're doing.  So
16   in no way are we violating the spirit of this agreement.

17   It was during those negotiations -- and in no way, of
18   course as the Court knows, who holds the cards in
19   negotiations, you -- there's some things you can convince with
20   an expert report and there's some things you can't.  Please
21   don't take the impression that we didn't try and that we
22   agreed to what we agreed to and we are not backing off that
23   agreement one inch, but we are also pursuing what we think is
24   the government's suggestion, which is that we argue for a
25   variance.

 1          And we think a variance is appropriate here in the degree

 2     of what Mr. Byerly possessed, from four levels for someone

 3     with a loaded gun, down to zero levels that individuals that

 4     didn't get the enhancement, who pummelled officers with their

 5     fists but just didn't have something.  So that's the position

 6     that we're taking, Your Honor.

 7          THE COURT:  Okay.  Thank you.

 8          All right.  As I mentioned, I want to go take another look

 9     at one or two of those videos.  So I'll take a 10-minute break

10     and I'll come back and impose sentence.

11          (Recess from 12:42 p.m. to 12:54 p.m.)

12          THE COURT:  I have assessed the particular facts in

13     this case in light of the relevant 3553(a) factors, including

14     the sentencing guidelines.  And I want to provide some remarks

15     for the record and for Mr. Byerly about my consideration.

16          Starting with the nature of the offense, obviously any

17     consideration of the nature of the offense has to be

18     considered in the context of what was happening that day,

19     which was an assault on democracy.  This wasn't just any riot

20     taking place; it was a riot which was interfering with the

21     ability of the Congress to discharge one of its most sacred

22     functions, and one of the most sacred functions in a democracy

23     where members of Congress from both political parties who are

24     assembling to engage in the peaceful transition of power,

25     which is so fundamental to what the nature of this government

is about.

And I have to say with respect to this point, I was very glad to hear Mr. Byerly say to me that one of the lessons he's taken from all of this is that violence has no place in the political process.

With respect to the particulars and Mr. Byerly, this is a little bit more complicated because I think that there's agreement that the device that Mr. Byerly actually used was not a harmful device; it was not anything that, even if deployed, would have resulted in any type of injury short of perhaps striking somebody with it, but that it was not a functioning stun gun.  And that obviously is an important consideration.

On the other hand, it certainly appeared to be a functioning stun gun, and I think that the police officers quite reasonably, and that anyone in their position would have, seen this as a functioning stun gun because of the sound that it emitted and they clearly thought it was a stun gun and they were clearly frightened by it.  And it distracted them from the discharge of their responsibilities to protect the Capitol while they dealt with Mr. Byerly.  And it undoubtedly added to the fear that the officers encountered that day.

And when you just listen to the video, and the noise level on it, I think Mr. Byerly himself acknowledged this, just the noise that was taking place that day and the anger in that

1  crowd, it's very hard to imagine being in that position in

2  which you are one of the people who is there trying to protect

3  the Capitol and there is an assault on your nation and an

4  assault on you and a very angry crowd.  And to have somebody

5  come at you with a device that appears to be a stun gun is

6  undoubtedly a very frightening thing to happen.

7  And I also have to put into context that that was not the

8  only misstep by Mr. Byerly that day, and that putting his

9  hands in a violent manner on that AP reporter, as Mr. Byerly

10  has acknowledged, was a major mistake he made that day.  And

11  you can imagine how fearful that person must have been, being

12  yanked down those stairs repeatedly, being surrounded by an

13  angry mob.  I can only imagine that it crossed his mind that

14  he was not going to survive what happened that day.

15  I know Mr. Byerly was not the one who shoved him over the

16  wall, but for me one of the more uplifting moments was to see

17  that there was a man on the other side of the wall who came to

18  his aid, got his camera back for him and helped him leave.

19  But that man must have been extremely frightened as well under

20  those circumstances.  And Mr. Byerly did contribute to that by

21  violently grabbing him.  I think by my assessment it probably

22  was a period of five to 10 seconds when he pushed him aside

23  and then released him.

24  And then I did look back at the video of the large sign,

25  and I agree with Ms. Eve that the sign itself was a very

1    dangerous object, a very heavy object that was being -- by a

2    large and violent mob being shoved at the police officers.

3    Mr. Byerly barely got his hand on it.  He tried.  I think he

4    would have liked to have gotten closer to it.  He just wasn't

5    that close to it so he barely got his hand on it and didn't

6    contribute meaningfully to that.  But it was part of whatever

7    took over -- the demons that took him over that day, and so I

8    have to take that into consideration as well.

9        With respect to the characteristics of the offender, I have

10    to say, Mr. Byerly, I was enormously impressed by what you

11    said to me today.  And a judge never knows what's sincere and

12    what's not sincere.  It struck me as sincere and heartfelt and

13    something you had thought long and hard about, and that you

14    are truly remorseful about what happened that day, and that

15    you were shortly afterwards very remorseful that day and that

16    you're enough of an adult to look back at that and say this is

17    a regrettable thing that happened to me in my life.

18        And as you acknowledge, there are consequences for that,

19    and I don't mean to suggest there are not consequences, but

20    your comments were meaningful to me.

21        As to the types of sentences that are available, I think

22    everyone is in agreement that the guidelines range is between

23    37 and 46 months.  The probation office has recommended a

24    sentence that is midway between the poles at 41 months.  The

25    government has requested at least 46 months, and the defense

1    has requested a downward variance.  Although I think at one

2    point I heard a reference to four levels, I'm not sure there

3    was a specific number that was assigned for the variance

4    you're seeking, Mr. McHugh?

5        MR. MCHUGH:  That's right, Your Honor.  I meant the

6    four levels as by way of example.

7        THE COURT:  Okay.  That's fine.

8    And I've also given a lot of thought, as all the judges in

9    this court do, to trying to treat like cases alike and figure

10   out how this case fits into the overall architecture of

11   sentencing with respect to what happened that day.  And I've

12   tried to come up with a sentence that I think fits for present

13   purposes.

14   And what I'm going to do is, in light of the fact that the

15   device that Mr. Byerly used was not in fact a functioning stun

16   gun and could not have inflicted any injury on somebody short

17   of perhaps striking them with something in the nature of a

18   flashlight, but at the same time cognizant that it invoked

19   substantial fear and was designed to invoke fear in those

20   officers, I'm inclined to vary downward by two rather than

21   four levels, sort of giving half credit with respect to the

22   nature of the device.  I wouldn't vary down that much if it

23   weren't for Mr. Byerly's remorse and how convincing I found

24   his statement to the Court.

25   And so if I vary downward two levels, that takes me to a

1   range of between 30 and 37 months.  And midway between, in
2   middle of that range it would be I think 33 and a half.  And
3   what I'm going to do is -- I'll impose the sentence in a
4   minute but I'm going to impose a sentence of 34 months.  And
5   the reason I went a little bit up from the 33 and a half is
6   again trying to have some reasonableness to the various
7   sentences, and I think you all referred to the *Miller* case
8   that I had where I imposed a sentence I believe of 33 months
9   on a defendant who did something frankly that was more
10  dangerous than what Mr. Byerly did.  He discharged a fire
11  extinguisher into the tunnel at the police officers and he
12  threw batteries in there.  And I think that was substantially
13  more dangerous than what Mr. Byerly did.

14      But I believe he was 19 years old and drunk at the time.
15  And so in trying to make all the pieces fit together, that
16  strikes me as a fair sentence under the circumstances.  So in
17  light of Mr. Byerly's substantial remorse as well as the fact
18  that the stun gun was not a functioning stun gun, but also
19  cognizant of the fact that there was a second assault that
20  took place that same day, and cognizant of the fact that
21  Mr. Byerly was certainly a grown man capable of knowing
22  better, I don't think I can justify going lower than that in
23  my sentence.

24      So pursuant to the Sentencing Reform Act of 1984 and the
25  considerations of the provisions of 18 U.S.C. § 3553 as well

1    as the advisory guidelines, it is the judgment that you, Alan

2    William Byerly, are hereby committed to the custody of the

3    Bureau of Prisons for a term of 34 months on Count 2 and a

4    term of 12 months on Count 7.  Those terms are to run

5    concurrently.  You are further sentenced to serve 36 months of

6    supervised release as to Count 1, and 12 months --

7         THE DEPUTY CLERK:  Count 2, Your Honor.

8         THE COURT:  I apologize.  Count 2.  Thank you.  On

9    Count 2.  And did I say it right with the first ones, Kristin?

10        THE DEPUTY CLERK:  Yes.

11        THE COURT:  And 12 months -- I'm sorry.  36 months of

12   supervised release on Count 2, 12 months of supervised release

13   on Count 7.  Those terms shall also run concurrently.  In

14   addition, you're ordered to pay a special assessment of $100

15   on Count 1 and $25 on Count 7, for a total of $125.

16        In accordance with 18 U.S.C. 3013, while on supervision you

17   shall abide by the following mandatory conditions as well as

18   the standard conditions of supervision, which are imposed to

19   establish the basic expectations for your conduct while on

20   supervision.  The mandatory conditions include you must not

21   commit another federal, state, or local crime; you must not

22   unlawfully possess a controlled substance; you must refrain

23   from any unlawful use of a controlled substance; you must

24   submit to one drug test within 15 days of placement on

25   supervision, and at least two periodic drug tests thereafter,

as determined by the Court.  You must cooperate in the collection of DNA as directed by your probation officer.  You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A and any other statute authorizing a sentence of restitution.  You must participate in an approved program for domestic violence.

You must also comply with the following special conditions.  Mental health assessment and treatment:  You must participate in the mental health assessment and comply with any treatment recommendations.  You must follow the rules and regulations of the program.  The probation officer, in consultation with the treatment provider, will supervise your participation in the program with respect to the provider location, modality, duration, and intensity.

I'm imposing that in part because you expressed some issues with respect to your mental health getting into this, and also I think you should be assessed for whether anger management treatment is appropriate.

You must submit to substance abuse testing to determine if you have used a prohibited substance.  You must not attempt to obstruct or tamper with the testing methods.  You must provide the probation officer access to any requested financial information and authorize the release of any financial information.  The probation office may share financial information with the United States Attorney's Office.

1    Within 45 days of your release from incarceration or

2    placement on supervision, you will appear before the Court for

3    a reentry progress hearing.  Prior to the hearing the

4    probation officer will submit a report summarizing your status

5    and compliance with the release conditions.

6    The United States Probation Office in the district in which

7    you are supervised will submit a progress report to the Court

8    within 30 days of the commencement of supervision.  Upon

9    receipt of the progress report the Court will determine if

10   your appearance is required.

11   The Court finds you don't have the ability to pay a fine

12   and therefore waives the imposition of a fine.  You're ordered

13   to make restitution to the Architect of the Capitol in the

14   amount of $2,000.  The Court determines that you do not have

15   the ability to pay interest, and therefore I waive any

16   interest or penalties that may accrue on the balance.

17   Restitution payments may be made to the Clerk of the Court

18   for the United States District Court for the District of

19   Columbia, with disbursement as follows:  Architect of the

20   Capitol, Office of the Chief Financial Officer, Ford House

21   Office Building, Room H2-205B, Washington, D.C., 20515, in the

22   amount of $2,000.

23   The financial obligations are immediately payable to the

24   Clerk of the Court for the United States District Court, 333

25   Constitution Avenue NW, Washington, D.C., 20001.  Within 30

1    days of any change of address you shall notify the Clerk of

2    the Court of any change until such time as the financial

3    obligation is paid in full.

4    The probation office shall release the presentence

5    investigation report to all appropriate agencies, which

6    include the United States Probation Office in the approved

7    district of residence, in order to execute the sentence in

8    this case.  Treatment agencies shall return the presentence

9    report to the probation office upon the defendant's completion

10    or termination of treatment.

11    Pursuant to 18 U.S.C. § 3742, you have a right to appeal

12    the sentence imposed by the Court if the period of

13    imprisonment is longer than the statutory maximum or the

14    sentence departs upward from the applicable sentencing

15    guidelines range.  If you choose to appeal, you must file any

16    appeal within 14 days after the Court enters judgment.

17    As defined in 28 U.S.C. § 2255, you also have the right to

18    challenge the conviction entered or sentence imposed if new

19    and currently unavailable information becomes available to

20    you, on a claim that you received ineffective assistance of

21    counsel in entering a plea of guilty to the offense or

22    offenses of conviction, or in connection with sentencing.  And

23    if you're unable to afford the cost of an appeal, you may

24    request permission from the Court to file an appeal without

25    cost to you.

1          Pursuant to *United States v. Hunter*, let me ask Ms. Eve

2     whether there are any objections to the sentence imposed that

3     have not already been noted for the record.

4          MS. EVE:  No objections, Your Honor.

5          THE COURT:  Mr. McHugh?

6          MR. MCHUGH:  No objections, Your Honor.

7          THE COURT:  All right.  Anything else we should

8     address?  Is there a motion?

9          MS. EVE:  Yes, Your Honor.  I make a motion to dismiss

10    Counts 1, 3, 4, 5, 6, and 8.

11         THE COURT:  I assume that's not objected to.

12         MR. MCHUGH:  No objection.

13         THE COURT:  That motion is granted.  If there's nothing

14    further --

15         MR. MCHUGH:  Your Honor, could the Court make a

16    recommendation that the Bureau of Prisons designate Mr. Byerly

17    to a facility as close as possible to his legal residence as

18    reflected in the presentence report?

19         THE COURT:  Yes.  Ms. Eve?

20         MS. EVE:  No objection.

21         THE COURT:  Okay.  I will do that.  Is there anything

22    else you want me to recommend with respect to programming?

23         MR. MCHUGH:  Not at this time, Your Honor.

24         THE COURT:  Okay.  All right.  Well, thank you.

25       Mr. Byerly, good luck to you.  I know that that was a bad

1   day in your life and that you're looking forward to getting

2   this behind you and moving on with your life.  So I wish you

3   luck.

4        THE DEFENDANT:  Thank you, Your Honor.

5        (Proceedings adjourned at 1:10 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne